## SPIES *v.* ILLINOIS.

### ORIGINAL.

Argued October 27, 28, 1887. — Decided November 2, 1887.

When application is made to this court, for the allowance of a writ of error to the highest court of a State under Rev. Stat., § 709, the writ will not be allowed if it appear from the face of the record that the decision of the Federal question which is complained of was so plainly right as not to require argument; especially if it accords with well considered judgments of this court.

It is well settled that the first ten articles of Amendment to the Constitution of the United States were not intended to limit the powers of the States, in respect of their own people, but to operate on the national government only.

*Hopt* v. *Utah,* 120 U. S. 430, affirmed to the point that when a challenge by a defendant in a criminal action to a juror for bias, actual or implied, is disallowed, and the juror is thereupon peremptorily challenged by the defendant and excused, and an impartial and competent juror is obtained in his place, no injury is done the defendant if, until the jury is completed, he has other peremptory challenges which he can use.

*Hayes* v. *Missouri,* 120 U. S. 68, affirmed to the point that the right to challenge is the right to reject, not the right to select a juror; and if from those who remain an impartial jury is obtained, the constitutional right of the accused is maintained.

A statute of Illinois passed March 12, 1874, Hurd's Stats. Ill. 1885, 752, c. 78, § 14, enacted that "in the trial of any criminal cause, the fact that a person called as a juror has formed an opinion or impression, based upon rumor or upon newspaper statements (about the truth of which he has expressed no opinion), shall not disqualify him to serve as a juror in such case, if he shall upon oath state that he believes he can fairly and impartially render a verdict therein in accordance with the law and the evidence, and the court shall be satisfied of the truth of such statement." At a trial, had in that State, of a persons accused of an offence punishable, on conviction, with death, the court ruled that, under this statute, "it is not a test question whether the juror will have the opinion, which he has

formed from the newspapers, changed by the evidence, but whether his verdict will be based only upon the account which may here be given by witnesses under oath." *Held*, that, as thus interpreted, the statute did not deprive the persons accused of a right to trial by an impartial jury; that it was not repugnant to the Constitution of Illinois, nor to the Constitution of the United States; and that, if the sentence of the court, after conviction, should be carried into execution, they would not be deprived of their lives without due process of law.

When the ground relied on for the reversal by this court of a judgment of the highest court of a State is that the error complained of is so gross as to amount in law to a denial by the State of a trial by an impartial jury to one who is accused of crime, it must be made clearly to appear, in order to obtain a reversal, that such is the fact, and that the case is not one which leaves something to the conscience or discretion of the court.

When a person accused of crime voluntarily offers himself on his trial for examination as a witness in his own behalf, he must submit to a proper cross-examination under the law of the jurisdiction where he is being tried, and the question whether his cross-examination must be confined to matters pertinent to the testimony in chief, or whether it may be extended to the matters in issue, is not a Federal question.

In order to give this court jurisdiction under Rev. Stat., § 709, because of the denial by a state court of any title, right, privilege or immunity claimed under the Constitution, or any treaty or statute of the United States, it must appear on the record that it was duly set up; that the decision was adverse; and that that decision was made in the highest court of the State.

Questions concerning the rights of parties under treaties of the United States with other powers cannot be raised in this court for the first time, if the record does not show that they were raised in the court below.

THIS was a petition for a writ of error, addressed in the first instance to MR. JUSTICE HARLAN.

The petitioners had been indicted, arraigned and tried in a state court of Illinois for an offence punishable with death under the laws of that State, and had been found guilty; and the proceedings in the trial court had been sustained by the Supreme Court of Illinois on appeal; and the petitioners had been sentenced to death, and the 11th day of November, 1887, had been named as the day for their execution.

Their petition, which was voluminous, set forth that the Supreme Court of Illinois had erred in its judgment, and had deprived them of their rights, privileges and immunities, and that in the proceedings at their trial there was drawn in ques-

tion the validity of certain statutes of the State of Illinois as being repugnant to the Constitution of the United States, which nevertheless had been adjudged by the court to be valid.

The petition then set forth the following act of March 12, 1874, Hurd's Stats. Ill. 1885, 752, c. 78, § 14:

"It shall be sufficient cause of challenge of a petit juror that he lacks any one of the qualifications mentioned in Section 2 of this Act; or if he is not one of the regular panel, that he has served as a juror on the trial of a cause in any court of record in the county within one year previous to the time of his being offered as a juror; or, that he is a party to a suit pending for trial in that court at that term. It shall be the duty of the court to discharge from the panel all jurors who do not possess the qualifications provided in this Act, as soon as the fact is discovered: Provided, if a person has served on a jury in a court of record within one year, he shall be exempt from again serving during such year, unless he waives such exemption: *Provided further*, that it shall not be a cause of challenge that a juror has read in the newspapers an account of the commission of the crime with which the prisoner is charged, if such juror shall state on oath that he believes he can render an impartial verdict according to the law and the evidence: and *Provided further*, that in the trial of any criminal cause, the fact that a person called as a juror has formed an opinion or impression, based upon rumor or upon newspaper statements (about the truth of which he has expressed no opinion), shall not disqualify him to serve as a juror in such case, if he shall upon oath state that he believes he can fairly and impartially render a verdict therein in accordance with the law and the evidence, and the court shall be satisfied of the truth of such statement."

It was charged that "in this case the criminal court of Cook County held that said statute controlled as to the qualifications of jurors, and that under this statute a man was a competent and qualified juror, and not subject to challenge for cause on account of prejudice or partiality, notwithstand-

ing any opinion formed and expressed by him touching the guilt or innocence of the accused, which opinion was based on what he had heard and read touching the matter inquired of, and notwithstanding the proposed juror stated that he still entertained an opinion that the defendants, or some of them, were guilty as charged, or upon the question of their guilt, and that he still believed to be true the accounts heard and read by him; and that his opinion was so fixed that it would require evidence, and even strong evidence, to change that opinion; provided only the juror would state that he did not know that he had expressed any opinion as to the truth of the reports read or heard by him prior to his being called as a juror, and that he believed he could render a fair and impartial verdict in the cause."

The petitioners objected that the statute as thus construed was repugnant to the provisions of Article 3, Section 2, Clause 3 of the Constitution of the United States, and of Articles 5, 6, and Section 1 of Article 14 of the Amendments to the Constitution; and also that it was repugnant to the provisions of the Constitution of the State of Illinois, especially those found in Sections 2 and 9 of Article 2. Those objections were overruled at the trial, and those rulings were sustained by the Supreme Court of Illinois, and it was averred that that court "thereby denied to the accused the claim, right, privilege and immunity of trial by an 'impartial jury,' and also by their decision deprived petitioners of life, liberty and property without 'due process of law,' and abridged the privileges and immunities of petitioners as citizens of the United States, contrary to and in violation of the Constitution of the United States."

It was next averred that the petitioners claimed in said cause the right, privilege and immunity, of the "equal protection of the law" guaranteed to them under Article 14 of the Amendments of the Federal Constitution; and such right, privilege and immunity were denied to them by the decision of said Supreme Court of said State, which decision was adverse to their claim:

(*a*) Because in this case the protection, privilege, right and immunity of a previous uniform construction [1] of the constitutions of the State of Illinois relating to the impartiality of jurors, and an opinion touching the prisoner's guilt, to remove which evidence would be required, were denied to the defendants, whereby they were deprived of "the equal protection of the laws," it being held in this case as against the petitioners by said Supreme Court of the State of Illinois, but without overruling, modifying or calling in question any of such prior opinions and decisions of said court, that the prior opinion of the proposed juror concerning the guilt of the accused, though firm and deeply seated, based on reports fully believed to be true, and though said opinion was of such a nature as would require evidence, and even strong evidence, for its removal, did not render such person disqualified to sit as a juror for the trial of this case and these petitioners.

(*b*) Because although the Supreme Court of Illinois had uniformly accorded to other persons accused of crime the protection in the selection of a jury of excluding from the jury, as disqualified by reason of partiality, favor or bias, persons who confessed a prejudice against the class of persons to which the defendants confessedly belonged; [2] and had uniformly held that the accused had the right to interrogate proposed jurors fully, so as to ascertain whether such prejudice was so strong as to probably affect their verdict; and also to advise the accused with reference to determining whether to exercise a peremptory challenge; [2] and although the record showed that the petitioners claimed the same "protection of the law" in the selection of the jury, and asked that persons be excluded therefrom who confessed that they had a prejudice against persons belonging to the classes or societies called Socialists, Communists, and Anarchists, to some of which defendants

[1] Referring to *Smith* v. *Eames*, 3 Scammon, 76; *Gardner* v. *People*, 3 Scammon, 83; *Vennum* v. *Harwood*, 1 Gilman, 659; *Baxter* v. *People*, 3 Gilman, 368; *Neely* v. *People*, 13 Ill. 685; *Gray* v. *People*, 26 Ill. 344; *Collins* v. *People*, 48 Ill. 146; *Chicago & Alton Railroad* v. *Adler*, 56 Ill. 344.

[2] Referring to *Winnisheik Ins. Co.* v. *Schueller*, 60 Ill. 465; *Chicago & Alton Railroad* v. *Buttolf*, 66 Ill. 347; *Lavin* v. *People*, 69 Ill. 303.

belonged; and that they asked the right to interrogate persons proposed to them as jurors, as to whether their admitted prejudice against the classes named was of such a character as in their opinion would influence their verdict, if it should appear that defendants belonged to such classes: yet the right to so interrogate such proposed jurors, and the right to challenge them for cause, were alike denied to the petitioners by the said Supreme Court of Illinois, and the decision of said court was against the right, privilege and immunity so claimed.

(c) Because although the Supreme Court of the State of Illinois had theretofore uniformly held that it was improper and illegal for the representative of the people in argument to the jury to go outside of the record, to make unsustained charges against the defendants, and to indulge in vituperation and abuse of the accused, and had held that for such improprieties the cause should be reversed;[1] yet in the case at bar, as appeared from the record, the prosecuting attorney was allowed by the trial court, in the face of objection made, to travel entirely outside of the record, and to make as against the defendants on trial for life, charges and statements having no foundation in the evidence in the record, and was also permitted to indulge in violently denunciatory and abusive language towards the accused.

This, it was alleged, was assigned for error in the Supreme Court of the State of Illinois; but that court upheld the action of the trial court in the particulars above referred to, and held that the action of the State's attorney in these regards was not objectionable in this case, thereby deciding adversely to the right, privilege and immunity claimed by the petitioners, and denying to them that equal protection of the laws guaranteed to, and claimed by, them under the Federal Constitution.

(d) Because the counsel for the prosecution had been allowed by the trial court, against the petitioner's objection, to refer to the failure of some of the defendants to testify, and the

---

[1] Referring to *Fox* v. *People*, 95 Ill. 71; *Hennies* v. *Vogel*, 87 Ill. 242.

Supreme Court on appeal had sustained the rulings of the court below in this respect in disregard of uniformly previous rulings to the contrary.

It was further alleged that, under the provisions of Article 4, and Article 14, Section 1, Clause 2 of the Amendments to the Constitution, and under the provisions contained in Section 10 of Article 2 of the Constitution of the State of Illinois, the petitioners claimed the right, privilege and immunity to be exempt from compulsion to testify against themselves; and that their conviction in a case where they were compelled to give testimony against themselves would be a conviction " without due process of law," contrary to the guarantee of the Constitution of the United States; but that the record showed that the petitioners were compelled to give testimony against themselves.

(*a*) That the petitioners, Fielden, Parsons, and Spies, were put upon the stand as witnesses in their own behalf: that thereupon, under pretence of cross-examination, the representatives of the State were permitted, over the objection and protest of those petitioners, to ask of them various questions, which said petitioners were required by the court to answer, which questions were not by way of cross-examination, but were upon entirely original and new matter, not referred to nor alluded to upon the direct examination in any way whatever; whereby the said petitioners were compelled to give testimony against themselves under such pretence of cross-examination, when on trial for a capital offence, and which testimony said petitioners were also compelled to give, and the same was received, as against all of the petitioners, who were jointly on trial, and were sought to be charged with the crime of murder, as the result of an alleged conspiracy to which the petitioners were claimed to be parties; that the Supreme Court of the State of Illinois had theretofore uniformly held that an accused person who took the stand as a witness in his own behalf was entitled to be protected in cross-examination, and that the cross-examination must be confined to the subject-matter of the direct examination: and

that by the decision of the Supreme Court in this respect the petitioners had been denied the right, privilege and immunity of exemption from compulsion to give testimony against themselves, claimed at the trial; had been deprived of their lives and liberty without due process of law; and had been denied the equal protection of the laws, contrary to the provisions of the Constitution of the United States.

(*b*) That it appeared from the record that the houses and business places of the petitioners were forcibly and violently entered, and searched by the officers of the State interested in the prosecution, without any warrant whatever for such action, such entries and searches being made long after the alleged murder charged against the petitioners; that in connection with such forcible entries and searches, various articles of property belonging to different of the petitioners were seized without warrant or authority by the said representatives of the State, which articles of property were offered and received in evidence in the trial court over the objection and exception of the petitioners; whereby the petitioners through such unlawful conduct upon the part of the representatives of the State, were through their property and effects compelled to give evidence against themselves. The petition particularly referred in this connection to questions put to Spies with reference to a letter and postal addressed to him by Johann Most, which, it was alleged, had been unlawfully taken from Spies' desk by the representative of the State, and it was averred that the introduction of this letter was in contravention of the principles laid down by this court.[1] This was averred to have been done contrary to the provisions of the Fourth, the Fifth, and the Fourteenth Amendments to the Constitution of the United States, and of the 10th section of Article 2 of the Constitution of the State of Illinois.

It was further alleged that the privileges and immunities of the petitioners under Article 14, Clause 1, of the Amendments to the Constitution of the United States, and under Sections 4 and 17 of Article 2 of the Constitution of the State of Illinois had been abridged:

---

[1] Referring to *Boyd* v. *United States,* 116 U. S. 616.

(*a*) That the act of the State of Illinois of March 27, 1874, Hurd's ed., 1885, 427, § 274, was as follows: 274. "An accessory is he who stands by, and aids, abets or assists, or who, not being present, aiding, abetting or assisting, hath advised, encouraged, aided or abetted the perpetration of the crime. He who thus aids, abets, assists, advises or encourages, shall be considered as principal and punished accordingly:" that under this act, petitioners claimed on the trial that mere advice, not to do the particular crime charged, but advice to a general revolutionary movement, having in view a change in the existing order of society, by public speech, writing or printing, could not make the petitioners guilty of a particular murder of an individual or individuals never advised nor committed by them; but that in order to establish their guilt in such a case, such alleged general advice must be accompanied by some encouragement, aiding, abetting or assisting to the particular act; in other words, that there must be some physical act as distinguished from mere general advice, as theretofore held by the Supreme Court of the State of Illinois:[1] but the Supreme Court of Illinois sustained the trial court in overruling this claim of the petitioners and thus denied them their said privileges and immunities.

(*b*) That the petitioners had asked the trial court to give certain instructions in regard to the right of peaceable assemblage which are set forth in the petition; that that court refused to give them; and that their refusal had been sustained by the Supreme Court, whereby they had denied to the petitioners the right, privilege and immunity of peaceable assemblage claimed by them, contrary to the law of the land, and whereby was denied to them that due process of law guaranteed to them under the Federal Constitution.

There were also allegations that certain instructions of the court relating to a conspiracy between the petitioners; relating to the cross-examination of the defendants and their witnesses in respect to their being "Socialists," "Anarchists," &c.; and in regard to the opinions which they entertained, whether

---

[1] Referring to *Cox* v. *People*, 82 Ill. 191, at page 192.

socialistic, communistic or anarchical, were, in view of c. 38, § 46, of the Criminal Code of Illinois *ex post facto* law, in violation of Section 10, Article 1, of the Constitution of the United States and of Section 11 of Article 2 of the Constitution of the State of Illinois: also allegations that certain other instructions relating to the weight of evidence and the proof of a conspiracy were given in violation of the same provisions in the Constitution of the United States; but these points were not pressed in the briefs or arguments.

It was also alleged that the petitioners claimed in the trial court that the provision in c. 38, §§ 274, 275, of the Statutes of Illinois, Hurd's ed., 1885, relating to accessories, was inconsistent with, in conflict with, in violation of, and repugnant to, the provisions of the Constitution of the United States and void, as not informing the petitioners, and not within the scope and meaning of, and not in compliance with the provision of the Constitution of the United States, that they should be informed of the nature and cause of the accusation: but the Criminal Court and the Supreme Court of the State of Illinois, the highest court of the State in which a decision in the suit could be had, in a final judgment passed in said court, decided in favor of the validity of said statute.

It was also charged that the indictments did not inform the petitioners of the nature and cause of the accusations against them as required by the Sixth Amendment to the Constitution, and that consequently the prisoners had been deprived of their liberty and were about to be deprived of their lives, without due process of law.

It was also charged that on the exhaustion of the regular panel, a person was appointed to summon the required talesmen; that the petitioners' counsel asked for instructions to him to summon them from the body of the county; that these were refused and that he was directed to exercise his own judgment in getting the best class of men; that "while summoning talesmen from among bankers, capitalists, wholesale and retail merchants, brokers, board of trade dealers, clerks, salesmen, &c., he excluded in his selections substantially

the entire class of daily wage-workers from his special venire;" that the petitioners duly objected to this at the trial, and after verdict and judgment made it the ground of a motion for a new trial, but that the objection and the motion were overruled; that this action of the trial court was specially assigned for error in the said Supreme Court of the State of Illinois; but that the said Supreme Court of the State of Illinois, by their final judgment and order in said cause, overruled the claim asserted and advanced by petitioners in this behalf, and denied to the petitioners in the premises the right, privilege and immunity claimed by them respectively of trial by an impartial jury; and by their said final judgment deprived the petitioners respectively of life and property, and of liberty and property, without due process of law, and also denied to the petitioners respectively "the equal protection of the laws" claimed by them; the said judgment and decision of said Supreme Court of Illinois being adverse to and in denial of the rights, privileges and immunities claimed by the petitioners respectively under, and to them guaranteed by, the Constitution of the United States, as above particularly invoked and set forth.

It was also averred that all the defendants were confined in jail under order of court when the sentence was passed, and none of them were allowed to be present then and there, nor were their counsel notified to be present at said time, and were not present, and that no notice of the determination of the Supreme Court of Illinois of their application for a new trial was given to them or to their counsel, or to any one of them; and no opportunity was afforded them to move in arrest of judgment before sentence was passed.

The petition prayed "for the allowance of a writ of error herein, and for such other process as is provided by law, to the end that the errors aforesaid done the petitioners in and by the proceedings, judgment and order of said Supreme Court of the State of Illinois in said cause, and as well by said criminal court of Cook County, may be corrected by the Supreme Court of the United States."

MR. JUSTICE HARLAN, to whom the petition was presented on the 21st October, 1887, said, in Chambers:

This is an application for a writ of error to bring up for review, by the Supreme Court of the United States, a judgment of the Supreme Court of the State of Illinois, involving the liberty of one of the petitioners, and the lives of the others. The time fixed for executing the sentence of death is, I am informed, the 11th day of November.

Under the circumstances, it is my duty to facilitate an early decision of any question in the case of which the Supreme Court of the United States may properly take cognizance. If I should allow a writ of error, it is quite certain that counsel would have to repeat, before that court, the argument they propose now to make before me. On the other hand, if I should refuse the writ, the defendants would be at liberty to renew their application before any other Justice of the Supreme Court; and, as human life and liberty are involved, that Justice might feel obliged, notwithstanding a previous refusal of the writ, to look into the case and determine for himself whether a writ of error should be allowed. If he, also, refused, the defendants could take the papers to some other member of the court; and so on, until each Justice had been applied to, or until some Justice granted the writ. In this way, it is manifest that delays might occur that would be very embarrassing, in view of the short time intervening between this day and the date fixed for carrying into effect the judgment of the state court.

As the case is one of a very serious character in whatever aspect it may be regarded, I deem it proper to make an order, which I now do, that counsel present this application to the court, in open session, to the end that early and final action may be had upon the question whether that court has jurisdiction to review the judgment in this case. There is no reason why it may not be presented to the court at its session to-day. Counsel may state that the application is made to the court pursuant to my directions.

*Mr. Roger A. Pryor* for petitioners, then presented the petition to the court on the same 21st day of October, and argued in support of it. The court took it under advisement, and, on the 24th of October, 1887,

Mr. Chief Justice Waite made the following announcement:

Following the precedent in *Twitchell* v. *The Commonwealth*, 7 Wall. 321, we have permitted this motion to be made in open court, at the suggestion of Mr. Justice Harlan, to whom the application was first presented, on account of the urgency of the case and its importance. But, as was said in that case, "writs of error to the state courts have never been allowed as of right," that is to say, as of course, and it is the duty of him to whom an application for such a writ is made to ascertain, from an examination of the record of the state court, "whether any question, cognizable here on appeal, was made and decided in the proper court of the State, and whether the case on the face of the record will justify the allowance of the writ."

Deeming that the proper practice, we will hear counsel on Thursday next, in support of this motion, not only upon the point whether any Federal questions were actually made and decided in the Supreme Court of the State, but also upon the character of those questions, so that we may determine whether they are such as to make it proper for us to bring the case here for review.

We have caused the Attorney General of Illinois to be informed that the motion will be heard at the time stated.

On Thursday, the 27th, and on Friday, the 28th, of October, 1887, argument was had.

*Mr. J. Randolph Tucker* for all the petitioners. *Mr. M. Salomon, Mr. W. P. Black* and *Mr. Roger A. Pryor* were with him on the opening brief.

I. Was a Federal question raised and decided in the state court? The act of 1867, 14 Stat. 385, c. 28, § 2, which took the place of the 25th section of the judiciary act of 1789, pro-

vides for a writ of error to the highest court of a State, where is drawn in question : (1) The validity of a statute of or authority exercised under any State, on the ground that the same is repugnant to the Constitution of the United States, and the decision is in favor of the validity; (2) Where a right, title, privilege, or immunity is claimed under the Constitution of the United States and the decision is against the right, title, privilege, or immunity specially set up or claimed. At the time of its passage the Fourteenth Amendment had already been proposed by Congress, and this act was no doubt passed in preparation for the peculiar questions which would arise under the amendment. The terms of the act and this coincidence indicate a liberal construction of it in regard to appeals.

In *Murdock* v. *Memphis*, 20 Wall. 590, the court say the law intended to give the litigant the right, if he *desired* it, to have his claim under the Constitution decided by this court. The writ does not issue *of course* but *of right*, where this court has jurisdiction. Its jurisdiction being settled, the writ of error is a writ of right. *Conflict* gives *jurisdiction*. *Repugnancy* requires *reversal*. *Armstrong* v. *Treasurer*, 16 Pet. 281 ; *Callan* v. *May*, 2 Black, 541, 543 ; *Furman* v. *Nichol*, 8 Wall. 44, 56 ; *Pennywitt* v. *Eaton*, 15 Wall. 380 ; *Hall* v. *Jordan*, 15 Wall. 393 ; *Arrowsmith* v. *Harmony*, 118 U. S. 194 ; *Hayes* v. *Missouri*, 120 U. S. 68. The appeal is a matter of common right. *Buel* v. *Van Ness*, 8 Wheat. 313. Referring then to *Twitchell* v. *The Commonwealth*, 7 Wall. 324, and *Bohanan* v. *Nebraska*, 118 U. S. 231, *Mr. Tucker* continued :

The course of decisions in this court is, I insist, uniform in allowing a writ of error upon claim of repugnancy; and this is laid down in the civil case of *Murdock* v. *Memphis, supra*, and the same rule would *in favorem vitæ* be upheld in a criminal case, especially a capital one. Even under the statute of 1789, § 25, the rule as to the mode in which the question should be raised was very liberal. The special clause of the Constitution to which the alleged repugnancy existed need not be stated. *Bridge Proprietors* v. *Hoboken Co.*, 1 Wall. 116 ; *Furman* v. *Nichol*, 8 Wall. 56 ; *Walker* v. *Sauvinet*, 92 U. S. 90. If it appears in the lower court of the State or in the high-

est court : *Crowell* v. *Randell*, 10 Pet. 368 ; *Craig* v. *Missouri*, 4 Pet. 410 ; *Minnesota* v. *Bachelder*, 1 Wall. 109 ; *Moore* v. *Illinois*, 14 How. 13, (where point was first taken in highest court of State,) and without clear reference to the conflict, if necessarily inferred. Same cases ; see specially *Satterlee* v. *Matthewson*, 2 Pet. 380 ; *Boughton* v. *Bank*, 104 U. S. 427. If an act of Congress was applicable to the case, it will suffice. Same cases ; *Miller* v. *Nicholls*, 4 Wheat. 311 ; *Ins. Co.* v. *Treasurer*, 11 Wall. 204 ; *Murray* v. *Charleston*, 96 U. S. 432 ; *Dugger* v. *Bocock*, 104 U. S. 596, 603 ; *Murdock* v. *Memphis*, *supra* ; *Tennessee* v. *Davis*, 100 U. S. 257 ; *Chicago Life Ins. Co.* v. *Needles*, 113 U. S. 574 ; *Brown* v. *Colorado*, 106 U. S. 95. Reference may be had to the opinion of the court. *Gross* v. *Mortgage Co.*, 108 U. S. 477 ; *Phila. Fire Association* v. *New York*, 119 U. S. 110.

This court has not only never been astute to deny its jurisdiction, but has been sometimes astute to find a ground on which to extend the protection of the Constitution to him who claims that his rights have been defeated by its violation. How much more so when life depends on the question : when the question is whether a man shall die because the supreme law has been overthrown by the judgment or law of a State ? And if this has been the rule under the act of 1789, *a fortiori*, it must be under the act of 1867. The latter act does not use the words found in the former, which confines the jurisdiction to cases where the question appears on 'he face of the record. *Murdock* v. *Memphis*, *supra*.

Having thus established the right to the writ of error if the question of repugnancy be raised expressly or by fair and just implication, I ask attention to the language of the act of 1867 : A writ of error lies : (1) If the repugnancy of a statute of a State, or of an authority exercised under any State, to the Constitution of the United States be claimed, or (2) A right, privilege, or immunity is claimed under the Constitution of the United States, and the decision of the state court is against the claim.

I maintain, therefore, (1) If the constitutionality of a state law was involved, or if the construction of that law by a court

exercising authority under the State, was repugnant to the Constitution, the jurisdiction of this court attaches. It is not only when a law is repugnant to the Constitution, but when the law, though constitutional, is so construed by state courts as to make its operation unconstitutional, that a writ of error lies. *Hall* v. *De Cuir*, 95 U. S. 485; *United States* v. *Harris*, 106 U. S. 629; *Virginia* v. *Rives*, 100 U. S. 313; *Ex parte Virginia*, 100 U. S. 339; *Strauder* v. *West Virginia*, 100 U. S. 303; *Neal* v. *Delaware*, 103 U. S. 370; *Civil Rights Cases*, 109 U. S. 3; *Yick Wo* v. *Hopkins*, 118 U. S. 356, and cases there cited. But where the conflict between the law or the state court, denying the right, privilege, or immunity arises, as in this case, under the Fourteenth Amendment, a very wide field of discussion opens before us, to which I invite the attention of the court.

It is settled by the cases above cited from 100 U. S. and by *Neal* v. *Delaware*, *supra*, that if the legislative, executive, or judicial departments, or any officers of a State, so exercise their authority as to violate the personal rights secured by the Fourteenth Amendment, it is the act of the State and is void.

The Fourteenth Amendment declares that no " State shall deprive any *person* of life, liberty, or property without due process of law." In *Hurtado* v. *California*, 110 U. S. 516, this court held that those words did not necessarily require an indictment by a grand jury in a state court in order to a legal conviction in a capital case, but that an accusation by a preliminary examination provided for under the state law was equivalent to an indictment; and based its conclusion upon the expositions of the common law prior to the Revolution, especially on the judgment of Lord Holt in *Rex* v. *Berchet*, 1 Shower, 106, and the argument of the reporter of that case; citing also *Rex* v. *Ingham*, 5 B. & S. 257; and also explaining the judgment of this court in *Murray* v. *Hoboken*, 18 How. 272. The opinion further compared the same words in the Fifth Amendment, where they are coupled with an express provision for a grand jury in capital and infamous crimes, with them as used in the Fourteenth Amendment, where no such provision was made.

But I find nowhere in that opinion, nor elsewhere in the decisions of this court, that a jury trial in criminal cases in state courts is not required by the words "due process of law," as the right of every man upon a trial for his life or liberty; and it would be a waste of words to argue that these words in the Fourteenth Amendment do secure to every person in every State a trial by jury before his life or liberty be taken away. The whole history of the common law as our ancestors brought it with them to this country; the memorable Declaration of Rights, on the 14th of October, 1774, in the first Continental Congress asserting it; the Bills of Rights of all the young Revolutionary Commonwealths; the arraignment of George III in the Declaration of Independence for its denial; the provision in the Ordinance of 1787, by which it was secured to every Northwestern State as its precious heritage; the uniform and concurrent political and judicial opinion of all jurists and statesmen in Great Britain and America for centuries, make it a mockery of words to hold that this language of Magna Charta in the Fourteenth Amendment left jury trial out of the term "due process of law" where life or liberty were in issue. See Blackstone Com. 349; 3 Story on Const. § 1783. "Due process" means consistency with common law right. There must be an impartial jury. Wharton on American Law, § 566. "Due process" means jury trial, made so by Magna Charta. 1 Kent, 612, 613, 614; *Regina* v. *Baldry*, 2 Denison, C. C. 430, 444; *Regina* v. *Jarvis*, L. R. 1, C. C. 96. So being twice put in jeopardy is against common law right. *Regina* v. *Bird*, 2 Denison, C. C. 94, 216.

In *Murray* v. *Hoboken*, 18 How., the question was not, is a jury within "due process of law," but, can there be "due process" without it, even as to property? The implicit meaning of the discussion in that case is that "due process of law" meant jury trial as essential in criminal cases. Now, if jury trial be secured to a person charged with crime as a part of "due process of law," what kind of jury is he entitled to? Is it a packed jury. or an impartial one? See Marshall, C. J., in *Burr's Case*, Robertson, Phila. 1808. Clearly the meaning

of trial by jury, as one of common law right, must comprehend that it shall be composed of impartial men — men without bias or prejudice, men fair and equal in their judgment between the State and the accused. And we claimed in the court of trial and in the highest court of the State, that these prisoners will be deprived of life and liberty without "due process of law," if a partial jury was packed upon them by the law of the State, or by the construction of that law by the courts of the State. For if the law, by judicial construction, provides an improper jury — a packed one — it is unconstitutional and void, and the judgment must be reversed; and on the other hand, if it be constitutional as construed, and the state court so enforces it as to make it a deprivation of life without due process of law, still the State has done the deed, and the judgment must be reversed.

And further: If the law, as applied to other citizens, by the highest court, differs essentially from the rulings in this case, so as to show that the protection afforded to others was denied to these prisoners, then they have been denied the equal protection of the laws by the State itself, contrary to the Fourteenth Amendment. And still further: If the constitution of the State, intended to protect all alike, is violated in this case and set at naught, the State has denied the equal protection of the law to these prisoners, and the judgment must be reversed.

One other provision of the Fourteenth Amendment will now be considered which is more comprehensive in its protection of personal rights than the one just considered. It is that:

"No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States." The meaning of this clause turns chiefly on what shall be deemed "privileges and immunities of citizens of the United States." A privilege is a special and peculiar right. An immunity is an exemption or relief from burden or charge. These words are used once in the original Constitution, Art. 4, § 2; and in respect to those privileges and immunities which are enjoyed by citizens of a State. What they are has been judicially defined partially in the judgment of Mr. Justice

Washington in the case of *Corfield* v. *Coryell*, 4 Wash. C. C. 371. He says: "We have no hesitation in confining these expressions to those privileges and immunities which are *fundamental*, which belong of right to the citizens of all free governments, and which have at all times been enjoyed by citizens of the several States which compose the Union from the time of their becoming free, sovereign, and independent." This definition was accepted as correct by this court in the *Slaughter-House Cases*, 16 Wall. 36, by all the judges; both those who concurred in the judgment and those who dissented. An historic view of the question was judicially taken in that case, and I venture to follow the same course.

When the Constitution was proposed by the Federal Convention September 17, 1787, to the several States for ratification, many of them in their conventions expressed an apprehension that by enlarged construction of the powers delegated to the General Government, and by enforced implication, the rights of the States and of the people would be endangered. The preamble of the Congress proposing them to the States shows this. It is stated that "the conventions of a number of the States having at the time of their adopting the Constitution declared a desire, in order to prevent misconstruction or abuse of its powers, that further declaratory and restrictive clauses should be added," &c. Those amendments have been held, chiefly upon the basis of this historic fact, to be confined to their operation as limitations on the Federal power over States and citizens.

But when the late war closed and all slaves were made free by the Thirteenth Amendment, the non-slave-holding States apprehended (whether justly or not is not here in question) that the late slave-holding States would make, or enforce already existing laws abridging the rights of the African race; and, jealous of state power, as our fathers had been jealous of Federal power, they gave American citizenship to the former slaves, and prohibited the States from abridging the privileges and immunities of persons holding such citizenship. Congress made a ratification of this amendment a precondition to the admission of the Southern States to representation in the

Union.  I may say that there was nothing in a restraint on the power of the States as to personal rights which was inconsistent even with the genius of the original Constitution.  In the freedom of intercourse and commerce desired and provided for — in the intercommunication of citizenship between the States — in the provisions for the extradition of criminals and slaves — in the denial to the States of power to coin money, to pass *ex post facto* laws and bills of attainder, or laws impairing the obligation of contracts, our fathers meant to protect a citizen of New York while in Virginia, and *vice versa*, from the injurious effects of state laws on the rights of the citizens of every member of the Union; and hence when the Fourteenth Amendment secured the due process of law within the States for the citizens of all the States, it only extended the provisions already made in the original Constitution : because, as Taney, C. J., said : " For all the great purposes for which the Federal government was established we are one people, with one common country; we are citizens of the United States."  *Passenger Cases*, 7 How. 283.

Looking, then, to the purpose in view in adopting this Fourteenth Amendment, and to the historic condition of things which suggested it, and to the general consistency of its purpose with that which led to the original Constitution, I cannot think that we can go wrong in holding, as a canon for its true construction, that it shall have a liberal interpretation in favor of personal rights and liberty.  If the views of the minority of the court in the *Slaughter-House Cases*, 16 Wall. 36, be adopted, the argument I shall present would only be the stronger, but I shall rest upon that of the majority, as above cited.

I hold the privilege and immunity of a citizen of the United States to be such as have their recognition in or guaranty from the Constitution of the United States.  Take then the declared object of the Preamble, " to secure the blessings of liberty to ourselves and our posterity," we ordain this Constitution — that is, we grant powers, declare rights, and create a Union of States.  See the provisions as to personal liberty in the States guarded by provision as to *ex post facto* laws, &c.; as to con-

tract rights — against States' power to impair them, and as 'to legal tender; the security for *habeas corpus;* the limits imposed on Federal power in the Amendments and in the original Constitution as to trial by jury, &c.; the Declaration of Rights — the privilege of freedom of speech and press — of peaceable assemblages of the people — of keeping and bearing arms — of *immunity* from search and seizure — *immunity from self-accusation,* from second trial — and privilege of trial by due process of law. In these last we find the privileges and immunities secured to the citizen by the Constitution. It may have been that the States did not secure them to all men. It is true that they did not. Being secured by the Constitution of the United States to all, when they were not, and were not required to be, secured by every State, they are, as said in the *Slaughter-House Cases,* privileges and immunities of citizens of the United States.

The position I take is this: Though originally the first ten Amendments were adopted as limitations on Federal power, yet in so far as they secure and recognize fundamental rights — common law rights — of the man, they make them privileges and immunities of the man as citizen of the United States, and cannot now be abridged by a State under the Fourteenth Amendment. In other words, while the ten Amendments, as limitations on power, only apply to the Federal government, and not to the States, yet in so far as they declare or recognize rights of persons, these rights are theirs, as citizens of the United States, and the Fourteenth Amendment as to such rights limits state power, as the ten Amendments had limited Federal power.

The history referred to shows that these ten Amendments had a double purpose: first, as a declaration of fundamental rights, and second, to prohibit their infringement by the Federal authority. I do not, in this proposition, controvert the doctrine of this court since *Barron* v. *Baltimore,* 7 Pet. 243 '; but I maintain that all the declared privileges and immunities in these ten Amendments of a fundamental nature and of common law right, not in terms applicable to Federal authority only, are privileges and immunities of citizens of the United

States, which the Fourteenth Amendment forbids every State to abridge. *Slaughter-House Cases*, at pages 79, 89, 93, 97, 98, and 118 ; *Bartemeyer* v. *Iowa*, 18 Wall. 129 ; *United States* v. *Cruikshank*, 92 U. S. 542. These declarations of the court show that the rights declared in the first ten Amendments are to be regarded as privileges and immunities of citizens of the United States, which, as I insist, are protected as such by the Fourteenth Amendment.

It will be objected that *Hurtado* v. *California* is contrary to this view. It is not. That was decided on a clause of the Fifth Amendment, which in its terms applied only to Federal courts — that is, it referred to cases in the land and naval forces, which belong only to the United States' jurisdiction. *Noscitur a sociis.* So, in *Walker* v. *Sauvinet*, 92 U. S. 90, as to the Seventh Amendment. In terms it applies to Federal courts — and yet in that case Field and Clifford, JJ., dissented. *Presser* v. *Illinois*, 116 U. S. 252, did not decide that the right to keep and bear arms was not a privilege of a citizen of the United States which a State might therefore abridge, but that a State could under its police power forbid organizations of armed men, dangerous to the public peace.

This conclusion is confirmed by the consideration that the propounders of the Fourteenth Amendment were looking to the protection of the freedmen from the peril of legislation in the South against those fundamental rights of free speech ; of freedom from unreasonable searches ; of double jeopardy ; of self-accusation ; of not being confronted with witnesses and having benefit of counsel and the like : and if these are construed as the privileges and immunities of citizens of the United States, the Fourteenth Amendment secures them ; otherwise not. The fundamental nature of these rights, as common law rights, which were recognized at the time of the Revolution as the inherited rights of all the States may be seen by reference to Tucker's Blackstone App., p. 305, Story, Constitution, § 1779, 1781–2–3. As to searches, self-accusation, &c., see Story, § 1895 ; May's Const. History of England, Vol. 3, Ch. 11 ; and especially *Boyd* v. *United States*, 116 U. S. 616.

In the Bill of Rights of Virginia, June 12, 1776, George

Mason took the resolution of the House of Commons for the 10th article. So in the other States.

The connection between the immunity from unreasonable search for papers and self-accusation is pointed out strongly in the opinion in *Boyd* v. *United States*, and in that case and in the authorities above quoted they were held to be fundamental common law rights, and as such privileges and immunities of the citizens of the United States. So that, whether the compulsion to testify as to the papers illegally seized upon, in the unreasonable search in this case, be regarded as a violation of a privilege or immunity of a citizen of the United States, or as contrary to "due process of law," it is equally vicious, unconstitutional, and void. I repeat — if, under due process, compulsory self-accusation is disallowed; or if it be a privilege or immunity of a citizen of the United States not to be self-accused by compulsion; in either case, the Fourteenth Amendment condemns this judgment.

One word more on this point. If the State cannot abridge the privilege of a citizen of the United States, the same limitation applies to an alien, for *no person* shall be denied the equal protection of the laws. So that all of these defendants are, whether citizens or aliens, alike protected from the abridgment of these privileges and immunities of citizens.

Enough has been said to justify the following conclusions: (1) A trial by an impartial jury. is secured by the Fourteenth Amendment to these prisoners. (2) A trial without self-accusation, either by compulsion to give evidence or by the production of papers illegally seized, is also secured.

But suppose I am wrong in this. If the search and self-accusation were not repugnant to the Fourteenth Amendment, yet it was repugnant to the constitution of Illinois. Now, if the constitution of Illinois is denied to *these prisoners*, when accorded to others, we are denied the equal protection of the laws of Illinois. In other words, I insist (1) If anything is done not according to due process of law, or to abridge the privileges or immunities of citizens of the United States, contrary to the Fourteenth Amendment, the writ must be allowed and the judgment reversed. (2) If the action of the court was not in

violation of the clauses of the Fourteenth Amendment referred
to, yet if the rights accorded and secured by the constitution
and laws of Illinois be refused to these men, they are denied
the equal protection of the laws, and the writ must be allowed
and the judgment reversed.

Upon the law of selecting jurors and challenges I refer to
*Queen* v. *Hepburn*, 7 Cranch, 290; *Reynolds* v. *United States*,
98 U. S. 145, 154, citing Lord Coke, "that a juror must be
indifferent, as he stands unsworn," and also Marshall, C. J., in
*Burr's trial*, 416; and to *Hayes* v. *Missouri*, 120 U. S. 68, 70,
Field, J., on the value of peremptory challenges. See also
radical differences between the New York law and this one.

On this last point one remark is proper. If a talesman be
*rejected* for cause improperly, and a good and unobjectionable
juror be obtained, no complaint can be made. But it is dif-
ferent if such talesman be adjudged good by the court, when
he should be rejected, and the injury to the accused is real,
though it cannot be estimated. This arises from the nature
of the procedure. The accused has a right to secure an impar-
tial jury by excluding all whom he can *prove* to be bad, or
suspects without being able to adduce such proof. As to the
former, he challenges for cause; as to the latter, of his own
will. Where the latter are limited in number, wrong rulings
against his challenge for cause circumscribes his peremptory
privilege, by forcing him to choose between the party chal-
lenged for cause without effect and one against whom he has
no proof, but only suspicion.

[Mr. Tucker then examined the facts in the record, and
claimed that they showed that the prisoners were tried by a
packed jury, and consequently were denied "due process of
law." In regard to the seizure, he claimed that it was done
without warrant and was illegal, citing *Boyd* v. *United States*,
*supra;* and in regard to the cross-examination of Spies, he
maintained that it was illegal, that it was not "due process of
law," and was an abridgment of his immunity.]

II. The court ask us whether the record justifies a review
of the case. We respectfully ask, Why not? If the questions
were raised, and the jurisdiction established, why should these

prisoners be denied a hearing, which they *desire*, before this court? *Murdock* v. *Memphis*, *supra*. We cannot be expected to urge grounds for reversal, on a motion to be *heard*. We ask to be heard in order to obtain a reversal. Hearing must precede affirmance or reversal. To discuss the merits in order to show our right to a writ, is not only premature, but a denial of the right of appeal.

Here is a record of two millions of words. It is unprinted. Counsel have not read — cannot read it. The court has not done so — could not have done so. In the dark, we pray an appeal, because we say the Constitution condemns our condemnation. Can we in this condition be expected to prove that the judgment should be reversed, when we only ask to have a chance to print the record and show the injustice done to us, upon which injustice we claim the writ? If granted, we will on the hearing establish our right to reverse the judgment.

*Mr. Roger A. Pryor* for the petitioners, submitted a separate brief, in addition to the general brief signed by him with the other counsel. In this he contended: I. That the Illinois statute is not "due process of law," within the meaning of that provision in the Constitution, citing *Murray* v. *Hoboken*, 18 How. 272; *Davidson* v. *New Orleans*, 96 U. S. 97; *Hoke* v. *Henderson*, 4 Devereaux, Law, 1 [*S. C.* 25 Am. Dec. 677]; *Wynhamer* v. *People*, 13 N. Y. 378; *Taylor* v. *Porter*, 4 Hill, 140 [*S. C.* 11 Am. Dec. 274]; *Hagar* v. *Reclamation District*, 111 U. S. 701; *Pennoyer* v. *Neff*, 95 U. S. 714; *Hurtado* v. *California*, 110 U. S. 516; *Kennard* v. *Louisiana*, 92 U. S. 480; *Brown* v. *Commissioners*, 50 Mississippi, 468; *Rowan* v. *State*, 30 Wis. 129; *Hopt* v. *Utah*, 110 U. S. 574; *In re Ziebold*, 23 Fed. Rep. 791; *Ex parte Bain*, 121 U. S. 1. II. That "due process of law" implies and requires trial by an impartial jury. *Work* v. *State*, 2 Ohio St. 296 [*S. C.* 59 Am. Dec. 671]; *People* v. *Johnson*, 2 Parker Cr. Cas. 322; *People* v. *Fisher*, 2 Parker Cr. Cas. 402; *People* v. *Toynbee*, 2 Parker Cr. Cas. 490, 562; *Cancemi* v. *People*, 18 N. Y. 128; *Ex parte Milligan*, 4 Wall. 2; *United States* v. *Reid*, 12 How. 361; *Olive* v. *State*, 11 Neb. 1; *Hayes* v. *Missouri*,

120 U. S. 68; *Reynolds* v. *United States*, 98 U. S. 155; *Cancemi* v. *People*, 16 N. Y. 501. III. That the Illinois statute makes competent a juror with a preconceived and present opinion as to the guilt of the accused. *Henderson* v. *The Mayor*, 92 U. S. 259; *Hall* v. *De Cuir*, 95 U. S. 485; *Stevens* v. *The People*, 38 Mich. 742; *Hayes* v. *Missouri, supra.* IV. That it is an ancient and inviolable principle of the criminal jurisprudence of this country that the accused shall be presumed to be innocent until his guilt is shown, and, by consequence, that the burden of proving his guilt is on the prosecution. *Wynhamer* v. *People, supra; Cummings* v. *Missouri*, 4 Wall. 277. V. By the Fourteenth Amendment of the United States Constitution, which forbids any State "to make or enforce any law which shall abridge the privileges or immunities of citizens of the United States," the Illinois statute is condemned as repugnant to that provision of the fundamental law. *Ex parte Virginia*, 100 U. S. 339. VI. The record discloses to demonstration that some of the petitioners were, by the production in evidence of papers and property unlawfully seized and taken, compelled to be witnesses against themselves. See *Boyd* v. *United States*, 116 U. S. 616. That the action of the state judiciary in these respects is the action of the State is well settled. *Ex parte Virginia, supra; Strauder* v. *West Virginia*, 100 U. S. 303; *Virginia* v. *Rives*, 100 U. S. 313; *Neal* v. *Delaware*, 103 U. S. 370; *Civil Rights Cases*, 109 U. S. 3; *Yick Wo* v. *Hopkins*, 118 U. S. 356. VII. The effect of the provision in the Fourteenth Amendment that "no State shall deprive any person of life, liberty or property without due process of law," is to transfer the fundamental rights and liberties enumerated in the original amendments and incorporate them in the Fourteenth Amendment; so that all the fundamental rights, privileges and immunities of American citizenship recognized in the original Constitution, are now placed under the ægis of the national sovereignty; and not one of those rights, privileges and immunities can be invaded or violated by state action without affording the victim the right of recourse to this tribunal for redress of the wrong.

*Mr. George Hunt,* and *Mr. Julius S. Grinnell,* opposing, cited: I. Under the general head that the record does not show that any Federal question is involved: *Murdock* v. *Memphis,* 20 Wall. 590; *Chouteau* v. *Gibson,* 111 U. S. 200; *Germania Ins. Co.* v. *Wisconsin,* 119 U. S. 473; *United States* v. *Cruikshank,* 92 U. S. 542; *Walker* v. *Sauvinet,* 92 U. S. 90; *Presser* v. *Illinois,* 116 U. S. 252; *Yick Wo* v. *Hopkins,* 118 U. S. 356; *Missouri* v. *Lewis,* 101 U. S. 22; *Hayes* v. *Missouri,* 120 U. S. 68, and cases there cited; *Barbier* v. *Connolly,* 113 U. S. 27; *Slaughter-House Cases,* 16 Wall. 36; *Arrowsmith* v. *Harmoning,* 118 U. S. 194; *Lehigh Water Co.* v. *Easton,* 121 U. S. 388. II. Under the general head that it does not appear from the record that a Federal question was raised and decided in the state court: *Starin* v. *New York,* 115 U. S. 248; *Germania Ins. Co.* v. *Wisconsin, supra; Ames* v. *Kansas,* 111 U. S. 449; *Detroit City Railway* v. *Guthard,* 114 U. S. 265; *Chouteau* v. *Gibson, supra; Santa Cruz County* v. *Santa Cruz Railway,* 111 U. S. 361; *Murdock* v. *Memphis, supra; Twitchell* v. *Commonwealth,* 7 Wall. 321; *Fox* v. *Ohio,* 5 How. 410; *Smith* v. *Maryland,* 18 How. 71; *Withers* v. *Buckley,* 20 How. 84. III. As to the validity of the jury act, other States have enacted similar laws, and their constitutionality has been sustained; notably in New York: *Stokes* v. *People,* 53 N. Y. 164; *Thomas* v. *People,* 67 N. Y. 218; *Phelps* v. *People,* 72 N. Y. 334; *Greenfield* v. *People,* 74 N. Y. 277; *Balbo* v. *People,* 80 N. Y. 484; *Cox* v. *People,* 80 N. Y. 500; *People* v. *Otto,* 101 N. Y. 690.

*Mr. Benjamin F. Butler* (for the petitioners Spies and Fielden only) contended that all the points raised by his associate counsel applied to Spies and Fielden; and that, in addition there were some considerations, not appertaining to the others, but which applied to them.

It cannot be doubted that at the time of their adoption, the first ten Amendments of the Constitution, in their inhibition, had no effect upon the acts of a state court so far as concerned proceedings in a trial in it. And if we relied only on those inhibitions, no Federal question would arise.

Citizens of the United States, however, then and still enjoyed privileges and immunities coming from an older and higher source than the Constitution. That instrument, Article 4, section 2, speaks of these privileges and immunities. They were inherent in each citizen of a State or the United States: — inherited from Great Britain under the common law and Magna Charta. Among them were (1) Trial by jury for high crimes; (2) Exemption from search and seizure without warrant of law; (3) Protection from self-accusation when a witness; and (4) Guaranty against being deprived of life, liberty, or property without due process of law. Thus all the rights, privileges and immunities which belonged to a British subject under Magna Charta, belonged to each citizen of the United States; and as new citizens of the United States were made by naturalization these rights came to them. Thus matters stood until the year 1866.

The condition of the negro after the war induced the adoption of the Fourteenth Amendment, the effect of which was, to clothe all the citizens of the United States with equal privileges and immunities which no State could abridge. If I am correct, that these immunities and privileges are the privileges of a citizen of a State, then, by the Fourteenth Amendment they become the privileges and immunities of citizens of every State; because every citizen of the United States becomes a citizen of some State; and by the 4th article of the Constitution, as lately interpreted by this court, is entitled to the privileges and immunities of a citizen in the several States, and thus by the Federal law, the citizens of all the States are clothed with the panoply of these privileges and immunities. The State is bound to so make and enforce its laws that all the rights, privileges and immunities of the citizen of the United States shall be secured to him; and if it fails to do so, then circumstances may arise under which proper process should go from the Federal court to the state court to correct that error, under such limitations as may be imposed by the statute authorizing the process.

Now in regard to the rights, privileges and immunities of these petitioners which were involved in the proceedings in

the state courts, nothing need be said as to protection from unlawful seizure; no doubt has ever arisen about that. The meaning and scope of the provision against self-accusation are also well understood. Not to be deprived of life, liberty or property, "without due process of law," is not so accurately defined. It is however but another form of the expression of the common law laid down by Lord Coke, *per legem terræ*, by the law of the land; that is of the *whole* land; not the law of a county, or of a province, or of any one state, but the law of the whole land. That is the law of the land, and was so understood by our forefathers as due process of law. Any other meaning given to the words "due process of law," as used in the Fourteenth Amendment, would make it simply ridiculous and frivolous; because any State may enact a due process of law, according to that State, by which a man's life may be taken, from which not a single right, privilege or immunity of citizenship can protect him. And any law a State may make, after the passage of the Amendment, for dealing with the rights of a citizen of the United States becomes wholly inoperative; because the "law of the land" must forever remain fixed as at that moment, not to be changed in regard to its citizens without a change of organic law; and for some purposes not to be even so changed.

If there could be any doubt as to the extent of the privileges and immunities of citizens of the United States, Spies and Fielden stand upon another ground which is impregnable. One is a citizen of Germany, the other of Great Britain; and there being no evidence that either was naturalized, he must be presumed to be an alien. *Hauenstein* v. *Lynham*, 100 U. S. 483. They are entitled to the privileges and immunities granted to them by treaties of the United States,[1] which, once conferred, cannot be taken away by municipal legislation. For,

---

[1] On the 5th November, 1887, Mr. Butler wrote to the Reporter: "I desire, if you see no incompatibility with your duty, that when you make your report you will refer to the treaty of 1794 between the United States and Great Britain, Fielden having been born in England, and to the Treaty of Amity and Commerce between Prussia and the United States, dated May 1, 1828, Article I, and also Article IX, the 'most-favored nation' clause."

a treaty once executed becomes a part of the organic law of the land, and cannot be varied by legislative enactment or judicial decision. It can never be altered or varied, except by the assent of the foreign power who was a party to it. It is binding both on the citizens of the United States and on the subjects of the foreign power residing here. Any provision of the constitution or of a statute of an individual State in conflict with the treaty is void, equally as if it were in conflict with the Constitution of the United States. Such a treaty has both a retroactive and a future effect. See *Hauenstein* v. *Lynham, supra.*

The office and desk of Spies, who was a German, were broken open by police officers of the State, headed by the prosecuting attorney, without warrant, and the letters and contents of the desk were carried away. One letter and a postal card, each from Johann Most, which were deemed to implicate Spies, were produced by the prosecuting attorney, he stating at the time that they were part of the letters so seized. They were placed before Spies when he was on the stand, and he was asked whether he had received them from Most. Objection was made to his being so asked, but the court compelled him to answer. He identified them: this was the only evidence of identification. Discussion was had whether it could be read in evidence. Objection was made that it was obtained by the State by an unlawful seizure, but the court ruled that that matter could not be investigated there. This being so, the only question here is, whether his rights, privileges and immunities as a foreigner, which are protected by treaty fully and equally with those of any citizen and are never to be changed from what they were when they accrued, by any power save war, can be wholly abrogated, set aside and trampled upon by a state court, and there can be no redress in the Supreme Court of the United States because no means have been provided to bring before it the matter by which the life of the party thus to be murdered can be saved?

If it be said that the injured party did not make sufficiently formal objection to what was done; that he waived the protec-

tion which the treaties throw about him, the answer is that, in a capital trial the prisoner cannot waive, willingly or unwillingly, anything which may affect the issues in that trial. *Commonwealth* v. *Webster*, 5 Cush. 386, 404 [*S. C.* 52 Am. Dec. 711]; *Commonwealth* v. *Mahar*, 16 Pick. 120; *Commonwealth* v. *Andrews*, 3 Mass. 126, 133.

But the defendants are not remitted solely to this claim of right to be heard. We deny that § 709 of the Revised Statutes is to be read as if it required that the defendant should say that he claimed his immunity under the Constitution. The claim must be an immunity or privilege arising under the Constitution; but it is not necessary that the party should *say*, in addition, that he claims the privilege under the Constitution of the United States. It cannot be that when a party is setting up in his own behalf a constitutional safeguard against the taking of his letters from him by an unlawful search and seizure, and offering them in evidence against him that the trial court, by interposing and saying "that subject cannot be investigated here," can prevent him from a full statement of the violation of his treaty rights, and prevent him from getting a hearing on the question here. Nor has it done so. For the record shows that in the Supreme Court of Illinois his contention in this respect was considered. The opinion of that court recites that the main contention there was that, after Spies' arrest certain effects of his, including this letter, were seized by the police without warrant or other legal process, and that such seizure was in violation of the constitutions, both of the United States and Illinois. That such a specification of claim to constitutional protection is sufficient is abundantly shown by the cases cited by my colleagues.

The indictment consists of sixty-nine counts, and sets forth the alleged crime, not in the manner secured to Englishmen in the time of the Revolution, but according to a statute of Illinois enacted fifty years after the Revolution. In the case of Spies and Fielden, after the treaties of peace and amity with countries which assured them protection against any change in due process of law by all future state laws, the question

now arises : Can these prisoners be tried for an. alleged crime in a different manner, and with different forms of procedure, by a State, from that which existed when these rights accrued? See *United States* v. *Forty-Three Gallons of Whiskey*, 93 U. S. 188; especially the following passage on page 198: "If a treaty to which the United States is a party removed such disability, and secured to them the right so to take and hold such property as if they were. natives of this country, it might contravene the statutes of a State; but, in that event, the courts would disregard them and give to the alien the full protection conferred by its provisions."

If this conduct of the state courts will not entitle these prisoners to a writ, then it would seem to be useless to undertake to present a stronger claim, arising out of this. or any other record. I desire to bring to the attention of the court some of the hardships which the reference of this question by the learned associate justice to the whole court imposes upon these defendants. . . . The grievance which I most respectfully but earnestly set forth in behalf of my clients is that, by the course that the cause has been made to take, we go to hearing on an imperfect record, as certified by the clerk of the state court, but which has not been and cannot be made a part of the record of this court, until a writ of error shall issue to bring it up. And that thereupon, a proceeding for a certiorari taken, so as to have the record amended, certified, and sent up to this court for its action.

Nor is the matter wrongfully set up in the record slight or immaterial. The record shows that a new trial had been asked for in the Supreme Court of the State. It then proceeds to say that all the parties, to wit, the prisoners and the State, appeared in the Supreme Court, and that an .order was made that the motion be overruled, and that thereupon the Supreme Court then proceeded to make sentence that seven of these prisoners be hanged until they were dead.

The record does not show that the prisoners were asked whether they had anything to say further before sentence should be passed upon them, and that part of the record is true, because the prisoners were not present, nor was either of

them, but they were confined in the jail on all of that day. Their counsel, or either of them, were not present when this sentence was pronounced; and the first knowledge, and the most like official knowledge which the prisoners had of their being sentenced to death in the near future, was reading it in the public prints.

In Archibold's Criminal Practice, Waterman's Notes, Vol. I, pp. 182–3, it is said (omitting the citations): It has from the earliest periods been a rule that, though a man be in the full possession of his senses when he commits a capital offence, if he becomes *non compos* after it he shall not be indicted; if after conviction, he shall not receive judgment; if after judgment, he shall not be ordered for execution. The true reason for this lenity is, not that a man who has become insane is not a fit object of example, though this might be urged in his favor; but that he is *incapable of saying anything in bar of execution, or assigning any error in the judgment.* Error may well be assigned on the omission of the *allocutus* or demand of the defendant what he has to say why judgment should not proceed against him. . . . Error may be assigned if sentence of death be passed against a prisoner not present in court.

If it be due process of law in this country that men, not being outlaws, can be sentenced to death in their absence from the court, being shut up in prison, which has never been done in a court in a civilized country before, and there is no method of correcting that misconduct which can be afforded by the highest court in the land, it will become a question seriously to be considered, which is to be preferred, such process of law or anarchy?

Mr. Chief Justice. Waite delivered the opinion of the court.

When, as in this case, application is made to us on the suggestion of one of our number, to whom a similar application had been previously addressed, for the allowance of a writ of error to the highest court of a State under § 709 of the Revised Statutes, it is our duty to ascertain not only

whether any question reviewable here was made and decided in the proper court below, but whether it is of a character to justify us in bringing the judgment here for reëxamination. In our opinion the writ ought not to be allowed by the court, if it appears from the face of the record that the decision of the Federal question which is complained of was so plainly right as not to require argument, and especially if it is in accordance with our well considered judgments in similar cases. That is in effect what was done in *Twitchell* v. *The Commonwealth*, 7 Wall. 321, where the writ was refused, because the questions presented by the record were "no longer subjects of discussion here," although if they had been in the opinion of the court " open," it would have been allowed. When, under § 5 of our Rule 6, a motion to affirm is united with a motion to dismiss for want of jurisdiction, the practice has been to grant the motion to affirm when " the question on which our jurisdiction depends was so manifestly decided right, that the case ought not to be held for further argument." *Arrowsmith* v. *Harmoning*, 118 U. S. 194, 195 ; *Church* v. *Kelsey*, 121 U. S. 282. The propriety of adopting a similar rule upon motions in open court for the allowance of a writ of error is apparent, for certainly we would not be justified as a court in sending out a writ to bring up for review a judgment of the highest court of a State, when it is apparent on the face of the record that our duty would be to grant a motion to affirm as soon as it was made in proper form.

In the present case we have had the benefit of argument in support of the application, and while counsel have not deemed it their duty to go fully into the merits of the Federal questions they suggest, they have shown us distinctly what the decisions were of which they complain, and how the questions arose. In this way we are able to determine as a court in session whether the errors alleged are such as to justify us in bringing the case here for review.

We proceed, then, to consider what the questions are on which, if it exists at all, our jurisdiction depends. They are thus stated in the opening brief of counsel for petitioners:

"First. Petitioners challenged the validity of the statute of Illinois, under and pursuant to which the trial jury was selected and empanelled, on the ground of repugnancy to the Constitution of the United States, and the state court sustained the validity of the statute.

"Second. Petitioners asserted and claimed, under the Constitution of the United States, the right, privilege, and immunity of trial by an impartial jury, and the decision of the state court was against the right, privilege, and immunity so asserted and claimed.

"Third. The State of Illinois made, and the state court enforced against petitioners, a law (the aforesaid statute) whereby the privileges and immunities of petitioners, as citizens of the United States, were abridged, contrary to the Fourteenth Amendment of the Federal Constitution.

"Fourth. Upon their trial for a capital offence, petitioners were compelled by the state court to be witnesses against themselves, contrary to the provisions of the Constitution of the United States which declare that 'no person shall be compelled in any criminal case to be a witness against himself,' and that 'no person shall be deprived of life or liberty without due process of law.'

"Fifth. That by the action of the state court in said trial petitioners were denied 'the equal protection of the laws,' contrary to the guaranty of the said Fourteenth Amendment of the Federal Constitution."

The particular provisions of the Constitution of the United States on which counsel rely are found in Articles IV, V, VI, and XIV of the Amendments, as follows:

"Art. IV. The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."

"Art. V. No person . . . shall be compelled, in any criminal case, to be a witness against himself; nor be deprived of life, liberty or property, without due process of law."

"Art. VI. In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial by an impartial jury of the State and district wherein the crime shall have

been committed, which district shall have been previously ascertained by law."

"Art. XIV, § 1. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty or property, without due process of law."

That the first ten Articles of Amendment were not intended to limit the powers of the state governments in respect to their own people, but to operate on the National Government alone, was decided more than a half century ago, and that decision has been steadily adhered to since. *Barron* v. *Baltimore*, 7 Pet. 243, 247; *Livingston* v. *Moore*, 7 Pet. 469, 552; *Fox* v. *Ohio*, 5 How. 410, 434; *Smith* v. *Maryland*, 18 How. 71, 76; *Withers* v. *Buckley*, 20 How. 84, 91; *Pervear* v. *The Commonwealth*, 5 Wall. 475, 479; *Twitchell* v. *The Commonwealth*, 7 Wall. 321, 325; *The Justices* v. *Murray*, 9 Wall. 274, 278; *Edwards* v. *Elliott*, 21 Wall. 532, 557; *Walker* v. *Sauvinet*, 92 U. S. 90; *United States* v. *Cruikshank*, 92 U. S. 542, 552; *Pearson* v. *Yewdall*, 95 U. S. 294, 296; *Davidson* v. *New Orleans*, 96 U. S. 97, 101; *Kelly* v. *Pittsburg*, 104 U. S. 78; *Presser* v. *Illinois*, 116 U. S. 252, 265.

It was contended, however, in argument, that, "though originally the first ten Amendments were adopted as limitations on Federal power, yet in so far as they secure and recognize fundamental rights — common law rights — of the man, they make them privileges and immunities of the man as a citizen of the United States, and cannot now be abridged by a State under the Fourteenth Amendment. In other words, while the ten Amendments as limitations on power only apply to the Federal Government, and not to the States, yet in so far as they declare or recognize rights of persons, these rights are theirs, as citizens of the United States, and the Fourteenth Amendment as to such rights limits state power, as the ten Amendments had limited Federal power."

It is also contended that the provision of the Fourteenth Amendment, which declares that no State shall deprive "any person of life, liberty or property, without due process of law," implies that every person charged with crime in a State shall

be entitled to a trial by an impartial jury, and shall not be compelled to testify against himself.

The objections are in brief, 1, that a statute of the State as construed by the court deprived the petitioners of a trial by an impartial jury; and, 2, that Spies was compelled to give evidence against himself. Before considering whether the Constitution of the United States has the effect which is claimed, it is proper to inquire whether the Federal questions relied on in fact do arise on the face of this record.

The statute to which objection is made was approved March 12, 1874, and has been in force since July 1 of that year. Hurd's Rev. Stat. Ill. 1885, p. 752, c. 78, § 14. It is as follows:

"It shall be sufficient cause of challenge of a petit juror that he lacks any one of the qualifications mentioned in section two of this act; or if he is not one of the regular panel, that he has served as a juror on the trial of a cause in any court of record in the county within one year previous to the time of his being offered as a juror; or, that he is a party to a suit pending for trial in that court at that term. It shall be the duty of the court to discharge from the panel all jurors who do not possess the qualifications provided in this act, as soon as the fact is discovered: *Provided,* if a person has served on a jury in a court of record within one year, he shall be exempt from again serving during such year, unless he waives such exemption: *Provided further,* that it shall not be a cause of challenge that a juror has read in the newspapers an account of the commission of the crime with which the prisoner is charged, if such juror shall state on oath that he believes he can render an impartial verdict according to the law and the evidence: *And provided further,* that in the trial of any criminal cause, the fact that a person called as a juror has formed an opinion or impression, based upon rumor or upon newspaper statements (about the truth of which he has expressed no opinion), shall not disqualify him to serve as a juror in such case, if he shall upon oath state that he believes he can fairly and impartially render a verdict therein in accordance with the law and the evidence, and the court shall be satisfied of the truth of such statement."

The complaint is that the trial court, acting under this statute and in accordance with its requirements, compelled the petitioners against their will to submit to a trial by a jury that was not impartial, and thus deprived them of one of the fundamental rights which they had as citizens of the United States under the National Constitution, and if the sentence of the court is carried into execution they will be deprived of their lives without due process of law.

In *Hopt* v. *Utah*, 120 U. S. 430, it was decided by this court that when " a challenge by a defendant in a criminal action to a juror, for bias, actual or implied, is disallowed, and the juror is thereupon peremptorily challenged by the defendant and excused, and an impartial and competent juror is obtained in his place, no injury is done the defendant, if until the jury is completed he has other peremptory challenges which he can use." And so in *Hayes* v. *Missouri*, 120 U. S. 68, 71, it was said: " The right to challenge is the right to reject, not to select a juror. If from those who remain an impartial jury is obtained, the constitutional right of the accused is maintained." Of the correctness of these rulings we entertain no doubt.

We are, therefore, confined in this case to the rulings on the challenges to the jurors who actually sat at the trial. Of these there were but two — Theodore Denker, the third juror who was sworn, and H. T. Sanford, the last, who was called and sworn after all the peremptory challenges of the defendants had been exhausted.

At the trial the court construed the statute to mean, that, " although a person called as a juryman may have formed an opinion based upon rumor or upon newspaper statements, but has expressed no opinion as to the truth of the newspaper statement, he is still qualified as a juror if he states that he can fairly and impartially render a verdict thereon in accordance with the law and the evidence, and the court shall be satisfied of the truth of such statement. It is not a test question whether the juror will have the opinion which he has formed from newspapers changed by the evidence, but whether his verdict will be based only upon the account which may here be given by witnesses under oath."

Interpreted in this way, the statute is not materially different from that of the Territory of Utah, which we had under consideration in *Hopt* v. *Utah, ubi supra,* and to which we then gave effect. As that was a territorial statute, passed by a territorial legislature for the government of a territory over which the United States had exclusive jurisdiction, it came directly within the operation of Article VI of the Amendments, which guaranteed to Hopt a trial by an impartial jury. *Webster* v. *Reid,* 11 How. 437, 459. No one at that time suggested a doubt of the constitutionality of the statute, and it was regarded, both in the territorial courts and here, as furnishing the proper rule to be observed by a territorial court in empanelling an impartial jury in a criminal case.

A similar statute was enacted in New York, May 3, 1872, Session Laws of 1872, c. 475, 9 N. Y. Stat. at Large, Edmonds, 2d ed. 373; in Michigan, April 18, 1873, Acts of 1873, 162, Act 117, Howell's Stat., § 9564; in Nebraska, Comp. Stat. Neb. 1885, p. 838, Criminal Code, § 468; and in Ohio, Rev. Stat. Ohio, 1880, § 7278. The constitutionality of the statute of New York was sustained by the Court of Appeals of that State in *Stokes* v. *The People,* 53 N. Y. 164, 172, decided June 10, 1873, and that of Ohio, in *Cooper* v. *The State of Ohio,* 16 Ohio St. 328. So far as we have been able to discover, no doubt has ever been entertained in Michigan or Nebraska of the constitutionality of the statutes of those States respectively, but they have always been treated by their Supreme Courts as valid, both under the Constitution of the United States, and under that of the State. *Stephens* v. *The People,* 38 Mich. 739, 741; *Ulrich* v. *The People,* 39 Mich. 245; *Murphy* v. *The State,* 15 Neb. 383.

Indeed, the rule of the statute of Illinois, as it was construed by the trial court, is not materially different from that which has been adopted by the courts in many of the States without legislative action. *Commonwealth* v. *Webster,* 5 Cush. 295; *Holt* v. *The People,* 13 Mich. 224; *State* v. *Fox,* 1 Dutcher (25 N. J. L.), 566; *Oslander* v. *The Commonwealth,* 3 Leigh, 780; *State* v. *Ellington,* 7 Iredell, 61; *Smith* v. *Eames,* 3 Scammon, 76, 81. See also an elaborate note to this last case in

36 Am. Dec. 521, where a very large number of authorities on the subject is cited.

Without pursuing this subject further, it is sufficient to say that we agree entirely with the Supreme Court of Illinois in its opinion in this case that the statute on its face, as construed by the trial court, is not repugnant to § 9 of Art. 2 of the constitution of that State, which guarantees to the accused party in[1] every criminal prosecution "a speedy trial by an impartial jury of the county or district in which the offence is alleged to have been committed." As this is substantially the provision of the Constitution of the United States on which the petitioners now rely, it follows that, even if their position as to the operation and effect of that Constitution is correct, the statute is not open to the objection which is made against it.

We proceed, then, to a consideration of the grounds of challenge to the jurors Denker and Sanford, to see if in the actual administration of the rule of the statute by the court, the rights of the defendants under the Constitution of the United States were in any way impaired or violated.

Denker was examined by the counsel for the defendants when he was called as a juror, and, after stating his name and place of residence, proceeded as follows:

" Q. You heard of this Haymarket meeting, I suppose? A. Yes.

" Q. Have you formed an opinion upon the question of the defendants' guilt or innocence upon the charge of murder, or any of them? A. I have.

" Q. Have you expressed that opinion? A. Yes.

" Q. You still entertain it? A. Yes.

" Q. You believe what you read and what you heard? A. I believe it; yes.

" Q. Is that opinion such as to prevent you from rendering an impartial verdict in the case sitting as a juror under the testimony and the law? A. I think it is. "

At this stage of the examination he was "challenged for cause" for the defendants, but before any decision was made thereon the following occurred:

"Mr. GRINNELL (for the State): If you were taken and sworn as a juror in the case, can't you determine the innocence or the guilt of the defendants upon the proof that is presented to you here in court, regardless of your having any prejudice or opinion? A. I think I could.

" Q. You could determine their guilt or innocence upon the proof presented to you here in court, regardless of your prejudice and regardless of your opinion, and regardless of what you have read? A. Yes.

"The COURT: Do [Can] you fairly and impartially try the case and render an impartial verdict upon the evidence as it may be presented here and the instructions of the court? A. Yes; I think I could."

The court thereupon overruled the challenge, but before the juror was accepted and sworn he was further examined by counsel for the defendants, as follows:

"Mr. FOSTER: I was going to ask you something about the opinion that you have formed from reading the papers and from conversation. I believe you answered me before that you had formed an opinion from reading and hearing conversation. That is correct, is it? A. Yes; but I don't believe everything I read in the newspapers.

" Q. No; but you believe enough to form an opinion? A. Yes; I formed an opinion.

" Q. Was that opinion principally from what you read in the papers or was it from what you heard on the street? A. From what I read entirely.

" Q. Then you did believe enough of what you read to form an opinion upon the question of the guilt or innocence of these men, or some of them? A. Yes.

" Q. And I believe you said you also expressed your opinion which you have formed to others with whom you conversed? A. Yes; I have expressed that opinion.

" Q. During the expression of this opinion I will ask you whether you stated in substance to these persons or any of them that you believed enough of what you had read to form the opinion which you had?

"The COURT: Did you in any conversation that you had

say anything as to whether you believed or not the account which was in the newspapers which you read? A. No, sir; I never expressed an opinion in regard to whether the newspapers were correct or not.

"Q. You never discussed that matter at all? A. No, sir."

Then, after some inquiries as to his business, age, and residence, the examination by the counsel for the defendant proceeded:

"Q. Are you acquainted with any members of the police force of the city of Chicago that were present at the Haymarket meeting on the occasion referred to? A. No, sir.

"Q. Have you ever had any conversation with any one that undertook to detail the facts as they occurred at the Haymarket Square, or who claimed they had been there? A. No, sir.

"Q. Is your opinion entirely made up of what you have read distinguished from what you have heard? A. Entirely from what I have read in the newspapers.

"Q. Have you had much conversation with others in regard to it at or about your place of business or elsewhere? A. We have conversed about it a number of times there in the house.

"Q. There is where you have expressed, I presume, the opinion which you have formed? A. Yes, sir.

*     *     *     *     *

"Q. Do you know anything about socialism, anarchism, or communism? A. No, sir; I do not.

"Q. Have you any prejudice against this class of persons? A. I think I am a little prejudiced against socialism. I don't know that I am against anarchism. In fact, I don't really understand what they are. I do not know what their principles are at all.

"Q. I understand you to say that notwithstanding the opinion you formed at the time you read the newspaper that you now are conscious of the fact that you can try this case and settle it upon the testimony introduced here? A. Yes; I think I could.

"Q. And not be controlled or governed by any impression that you might have had heretofore? A. Yes, sir.

" Q. And the law, as given you by the court, governing it? A. Yes, sir.

" Q. In the conversations that you have had there at the store, you say you have expressed the opinion which you have formed before? A. Yes, sir.

" Q. Is that of frequent occurrence — that you have expressed the opinion you have formed? A. Well, I think I have expressed it pretty freely.

" Q. As to the number of times — as to whether it was frequent or not? A. O, no; we did not bring the matter up in conversation very often, but when we did we generally expressed our opinion in regard to the matter.

" Q. Your mind was made up from what you read, and you had no hesitancy in saying it — speaking it out. A. I don't think I hesitated.

" Q. Would you feel yourself any way governed or bound in listening to the testimony and determining it upon the prejudgment of the case you had expressed to others before? A. Well, that is a pretty hard question to answer.

" Q. I will ask you whether acting as a juror here you would feel in any way bound or governed by the judgment that you had expressed on the same question to others before you were taken as a juryman; do you understand that? A. I don't think I would.

" Q. That is, you have now made up your mind, or at least you have formed an opinion; you have expressed that freely to others. Now, the question is whether when you listen to the testimony you will have in your mind the expression which you have given to others and have to guard against that and be controlled by it in any way. A. No, sir; I don't think I would. I think I could try the case from the testimony regardless of this.

\*        \*        \*        \*        \*

" Q. I understand you to say that you believe that you can entirely lay to one side the opinion which you have formed; it would require no circumstances or evidence to overcome it if you were accepted as a juryman? A. I think I could lay aside that opinion I have formed.

" Q. You believe that you could? A. Yes."

Here the examination of the juror by the counsel for the defendant, so far as it seems to be important to the present inquiry, was closed. Then on examination by the attorney for the State the following appears:

" Q. Do you know anything of the counsel upon the other side? A. No, sir.

" Q. You have men under you assisting you in shipping? A. No; there are no men under me.

" Q. Do you belong to any labor organization? A. No, sir.

" Q. You stated, I believe, that you didn't know much about anarchism or communism, and therefore you couldn't tell whether you had a prejudice or not. A. No, sir; I do not.

" Q. But you have read something about socialism? A. Yes, sir.

" Q. Do you believe in the maintenance of the laws of the State of Illinois and the Government of the United States? A. Yes, sir; I do.

" Q. Have you any sympathy with any individual or class of individuals who have for their purpose or object the overthrow of the law by force. A. No, sir.

" Q. Have you any conscientious scruples against the infliction of the death penalty in proper cases? A. No, sir.

" Q. If taken as a juror in this case do you believe you could determine the innocence or guilt of the defendants upon the proof presented to you here in court, under the instructions of the court, regardless of everything else? A. Yes; I think I could.

" Q. You know now of no prejudice or bias that would interfere with your duties as a juror? A. No, sir.

" Q. Are you a socialist, a communist, or an anarchist? A. No, sir.

" Q. You have no associations or affiliations with that class of people, so far as you know? A. No, sir."

At the close of this examination neither party challenged the juror peremptorily, and he was accepted and sworn. It is not denied that when this occurred the defendants were

still entitled to 142 peremptory challenges, or about that number.

When the juror Sanford was called he was first examined by counsel for defendants, and after some preliminary questions and answers, the examination, still by counsel for the defendants, proceeded as follows:

" Q. You know what case is on trial now, I presume? A. Yes.

" Q. Have you any opinion as to the guilt or the innocence of the defendants, or any of them, of the murder of Matthias J. Degan? A. I have.

" Q. You have an opinion; you say you have formed an opinion somewhat upon the question of the guilt or innocence of these defendants, do you mean, or that there was an offence committed at the Haymarket by the throwing of the bomb? A. Well, I would rather have you ask them one at a time.

" Q. All right. Have you an opinion as to whether or not there was an offence committed at the Haymarket meeting by the throwing of the bomb? A. Yes.

." Q. Now, from all that you have read and all that you have heard, have you an opinion as to the guilt or innocence of any of the eight defendants of the throwing of that bomb? A. Yes.

" Q. You have an opinion upon that question also? A. I have.

" Q. Did you ever sit on a jury? A. Never.

" Q. I suppose you know something about the duties of a juror? A. I presume so.

" Q. You understand, of course, that when a man is on trial, whether it be for his life or for any penal offence, that he can only be convicted upon testimony which is introduced in the presence and the hearing of the jury? You know that, don't you? A. Yes.

" Q. You know that any newspaper gossip or any street gossip has nothing to do with the matter whatever, and that the jury are to consider only the testimony which is admitted by the court actually, and then are to consider that testimony under the direction, as contained in the charge, of the court; you understand that? A. Yes.

" Q. Now, if you should be selected as a juror in this case to try and determine it, do you believe that you could exercise legally the duties of a juror — that you could listen to the testimony, and all of the testimony, and the charge of the court, and after deliberation return a verdict which would be right and fair as between the defendants and the people of the State of Illinois? A. Yes, sir.

" Q. You believe that you could do that? A. Yes, sir.

" Q. You could fairly and impartially listen to the testimony that is introduced here? A. Yes.

" Q. And the charge of the court, and render an impartial verdict, you believe? A. Yes.

" Q. Have you any knowledge of the principles contended for by socialists, communists, and anarchists? A. Nothing, except what I read in the papers.

" Q. Just general reading? A. Yes.

" Q. You are not a socialist, I presume, or a communist? A. No, sir.

" Q. Have you a prejudice against them from what you have read in the papers? A. Decided.

" Q. A decided prejudice against them? Do you believe that that would influence your verdict in this case, or would you try the real issue which is here, as to whether these defendants were guilty of the murder of Mr. Degan or not, or would you try the question of socialism or anarchism, which really has nothing to do with the case? A. Well, as I know so little about it in reality at present, it is a pretty hard question to answer.

" Q. You would undertake — you would attempt, of course, to try the case upon the evidence introduced here — upon the issue which is presented here? A. Yes, sir.

" Q. Now, the issue, and the only issue which will be presented to this jury, unless it is presented with some other motive than to arrive at the truth, I think is, did these men throw the bomb which killed officer Degan? If not, did they aid, abet, encourage, assist, or advise somebody else to do it? Now, that is all there is in this case; no question of socialism or anarchism to be determined, or as to whether it is right or wrong.

Now, do you believe that you can try it upon that theory and return a verdict upon that theory and upon that issue? A. Well, suppose I have an opinion in my own mind that they encouraged it?

"Q. Keep it — that they encouraged it? A. Yes.

"Q. Well then, so far as that is concerned I do not care very much what your opinion may be now, for your opinion now is made up of random conversations and from newspaper reading, as I understand? A. Yes.

"Q. That is nothing reliable. You do not regard that as being in the nature of sworn testimony at all, do you? A. No.

"Q. Now, when the testimony is introduced here and the witnesses are examined and cross-examined, you see them and look into their countenances, judge who are worthy of belief and who are not worthy of belief. Don't you think then you would be able to determine the question? A. Yes.

"Q. Regardless of any impression that you might have, or any opinion? A. Yes.

"Q. Have you any opposition to the organization by laboring men of associations, or societies, or unions so far as they have reference to their own advancement and protection, and are not in violation of law? A. No, sir.

"Q. Mr. Sanford, do you know any of the members of the police force of the city of Chicago? A. Not one by name.

"Q. You are not acquainted with any one that was either injured or killed, I suppose, at the Haymarket meeting? A. No.

\* \* \* \* \*

"Q. Mr. Sanford, are you acquainted with any gentlemen representing the prosecution — these three gentlemen, Mr. Grinnell, Mr. Ingham, Mr. Walker, and Mr. Furthman, who [is] not here at the present time? A. No, sir.

"Q. You are, I presume, not acquainted with any of the detective officers of the city of Chicago? A. Not to my knowledge.

"Q. Now, Mr. Sanford, if you should be selected as a juror in this case do you believe that, regardless of all prejudice or opinion which you now have, you could listen to the legitimate

testimony introduced in court and upon that and that alone render and return a fair and impartial, unprejudiced and un- biased verdict? A. Yes."

At the close of this examination on the part of the defend- ants, the juror was challenged in their behalf for cause, and the attorney for the State, after it was ascertained that all the peremptory challenges of the defendants had been exhausted, took up the examination of the juror; and as to this the record shows the following:

"Mr. INGHAM: Mr. Sanford, upon what is your opinion founded — upon newspaper reports? A. Well, it is founded on the general theory and what I read in the newspapers.

"Q. And what you read in the papers? A. Yes, sir.

"Q. Have you ever talked with any one who was present at the Haymarket at the time the bomb was thrown? A. No, sir.

"Q. Have you ever talked with any one who professed, of his own knowledge, to know anything about the connection of the defendants with the throwing of that bomb? A. No.

"Q. Have you ever said to any one whether or not you be- lieved the statements of facts in the newspapers to be true? A. I have never expressed it exactly in that way, but still I have no reason to think they were false.

"Q. Well, the question is not what your opinion of that was. The question simply is — it is a question made necessary by our statute, perhaps—— A. Well, I don't recall whether I have or not.

"Q. So far as you know, then, you never have? A. No, sir.

"Q. Do you believe that if taken as a juror you can try this case fairly and impartially, and render a verdict upon the law and the evidence? A. Yes."

At this stage of the examination the court remarked in reply to some suggestion of counsel as follows:

"The COURT. The defendants having challenged for cause, which is overruled, can, of course, stand where they are with- out saying anything more; but the effect of that, in my judg- ment, is that they accept the juror because they can't help

themselves. They have got no peremptory challenge; the challenge for cause is overruled, and, necessarily, the question now is for the State to say whether they will accept this juror or not. The common law is that all jurors not challenged, or to whom the challenge is not sustained, are the jurors to try the case. If they are not challenged for a cause which is sustained, and if they are not challenged peremptorily, then they are necessarily the jury to try the case. Now, in this instance, the defendants have no more peremptory challenges, and the challenge which they have made for cause is overruled; therefore, so far as the defendants are concerned, he is a juror to try the case."

This was accepted by both parties as a true statement of the then condition of the case, and after some further examination of the juror, which elicited nothing of importance in connection with the present inquiry, no peremptory challenge having been interposed by the State, Sanford was sworn as a juror, and the panel was then complete.

This, so far as we have been advised, presents all there is in the record which this court can consider touching the challenges of these two jurors by the defendants for cause.

In *Reynolds* v. *The United States*, 98 U. S. 145, 156, we said "that upon the trial of the issue of fact raised by" a challenge to a juror, in a criminal case, on the ground that he had formed and expressed an opinion as to the issues to be tried, "the court will practically be called upon to determine whether the nature and strength of the opinion formed are such as in law necessarily to raise the presumption of partiality. The question thus presented is one of mixed law and fact, and to be tried, as far as the facts are concerned, like any other issue of that character, upon the evidence. The finding of the trial court upon that issue ought not to be set aside by a reviewing court, unless the error is manifest. . . . It must be made clearly to appear that upon the evidence the court ought to have found the juror had formed such an opinion that he could not in law be deemed impartial. The case must be one in which it is manifest the law left nothing to the 'conscience or discretion' of the court." If such is the degree

of strictness which is required in the ordinary cases of writs of error from one court to another in the same general jurisdiction, it certainly ought not to be relaxed in a case where, as in this, the ground relied on for the reversal by this court of a judgment of the highest court of the State is, that the error complained of is so gross as to amount in law to a denial by the State of a trial by an impartial jury to one who is accused of crime. We are unhesitatingly of opinion that no such case is disclosed by this record.

We come now to consider the objection that the defendant Spies was compelled by the court to be a witness against himself. He voluntarily offered himself as a witness in his own behalf, and by so doing he became bound to submit to a proper cross-examination under the law and practice in the jurisdiction where he was being tried. The complaint is, that he was required on cross-examination to state whether he had received a certain letter, which was shown, purporting to have been written by Johann Most, and addressed to him, and upon his saying that he had, the court allowed the letter to be read in evidence against him. This, it is claimed, was not proper cross-examination. It is not contended that the subject to which the cross-examination related was not pertinent to the issue to be tried; and whether a cross-examination must be confined to matters pertinent to the testimony-in-chief, or may be extended to the matters in issue, is certainly a question of state law as administered in the courts of the State, and not of Federal law.

Something was said in argument about an alleged unreasonable search and seizure of the papers and property of some of the defendants, and their use in evidence on the trial of the case. Special reference is made in this connection to the letter of Most about which Spies was cross-examined; but we have not been referred to any part of the record in which it appears that objection was made to the use of this evidence on that account. And upon this point the Supreme Court of the State, in that part of its opinion which has been printed with the motion papers, remarks as follows:

"The objection that the letter was obtained from the de-

fendant by an unlawful seizure is made for the first time in this court. It was not made on the trial in the court below. Such an objection as this, which is not suggested by the nature of the offered evidence, but depends upon the proof of an outside fact, should have been made on the trial. The defence should have proved that the Most letter was one of the letters illegally seized by the police and should then have moved to exclude or oppose its admission on the ground that it was obtained by such illegal seizure. This was not done, and therefore we cannot consider the constitutional question supposed to be involved."

Even if the court was wrong in saying that it did not appear that the Most letter was one of the papers illegally seized, it still remains uncontradicted that objection was not made in the trial court to its admission on that account. To give us jurisdiction under § 709 of the Revised Statutes because of the denial by a state court of any title, right, privilege or immunity claimed under the Constitution, or any treaty or statute of the United States, it must appear on the record that such title, right, privilege or immunity was " specially set up or claimed " at the proper time in the proper way. To be reviewable here the decision must be against the right so *set up or claimed.* As the Supreme Court of the State was reviewing the decision of the trial court, it must appear that the claim was made in that court, because the Supreme Court was only authorized to review the judgment for errors committed there, and we can do no more. This is not, as seems to be supposed by one of the counsel for the petitioners, a question of a waiver of a right under the Constitution, laws or treaties of the United States, but a question of claim. If the right was not set up or claimed in the proper court below, the judgment of the highest court of the State in the action is conclusive, so far as the right of review here is concerned. The question whether the letter, if obtained in the manner alleged, would have been competent evidence is not before us, and, therefore, no foundation is laid under this objection for the exercise of our jurisdiction.

As to the suggestion by counsel for the petitioners Spies and

Fielden — Spies having been born in Germany and Fielden in Great Britain — that they have been denied by the decision of the court below rights guaranteed to them by treaties between the United States and their respective countries, it is sufficient to say that no such questions were made and decided in either of the courts below, and they cannot be raised in this court for the first time. Besides, we have not been referred to any treaty, neither are we aware of any, under which such a question could be raised.

The objection that the defendants were not actually present in the Supreme Court of the State at the time sentence was pronounced cannot be made on the record as it now stands, because on its face it shows that they were present. If this is not in accordance with the fact, the record must be corrected below, not here. It will be time enough to consider whether the objection presents a Federal question when the correction has been made.

Being of opinion, therefore, that the Federal questions presented by the counsel for the petitioners, and which they say they desire to argue, are not involved in the determination of the case as it appears on the face of the record, we deny the writ.

*Petition for writ of error is dismissed.*