Mr. Justice Hagner
delivered the opinion of the Court:
The defendant was indicted for the murder of Agnes Watson on the 24th day of September, 1888. He was tried, and a verdict of guilty as indicted rendered against him; whereupon he filed a motion in arrest of judgment, on the ground that the indictment failed to allege the death of the said Xgnes Watson. Upon hearing in General Term, the motion in arrest of judgment was sustained, and the defendant released and discharged from further prosecution in that case (20 D. C., 79).
He was again indicted on the 14th day of June, 1892, for the murder of Agnes Watson, in the case now on hearing; was tried and convicted, and sentenced tó be hanged on the 20th day of January, 1893.
When arraigned upon the indictment in this case he pleaded in bar the verdict of the jury in the first case. To this the United States demurred; and the demurrer being sustained the defendant pleaded not guilty, and went to trial, with the result above stated. He thereupon filed a motion for a new trial, specifying eight grounds of excep *458 tion. Of these the third and the fourth were abandoned by the defendant’s counsel at this healing. We proceed to examine the others.
1. The court below properly overruled the motion for a new trial based upon an affidavit of newly discovered evidence, made since the trial, by one Muller, who was about sixteen years of age at the time of the homicide. It set forth an alleged conversation he had the next day with a lad named Larue, then about thirteen. Larue was a witness on the first trial, but had died two months before the last trial. The affidavit professed to state what Larue said he had seen of the transaction on the night it occurred. No explanation sufficient or even plausible was made of Muller’s delay for three years and nine months to reveal what Larue had said to him. The supposed communication was distinctly hearsay, and could not have been received in evidence even if a new trial had been granted for any other reason. As one of the defendant’s counsel was allowed to give evidence at this trial of what Larue had testified at the former trial, no injury could have been done to the accused by this ruling, if it had not been correct, as it undoubtedly was.
2. The court below was right in overruling the defendant’s plea of former conviction. The General Term held the indictment upon which he was convicted on the first occasion was wholly insufficient, because it contained no proper allegation of the death of Agnes Watson. It was therefore void, and really not an indictment for murder, and the trial and so-called conviction were nullities. In the language of the Court of Appeals of Maryland, in 4 Gill, 498, State vs. Sutton: “ It cannot be said with correctness that a verdict which in legal contemplation is a nullity could jeopard the life or the limb of a party.” The former prosecution, therefore, was a mistrial, and there was a perfect right to indict the accused again. Cochrane vs. State, 6 Md., 406.
3. The point chiefly relied upon by counsel is the alleged error of the trial justice in overruling defendant’s objection to three of the jurors summoned in the cause; upon *459 the ground that they were disqualified because of bias against the prisoner. Upon their examination to ascertain whether such bias existed, each of them admitted, though in different terms, that he had formed an opinion as to the guilt or innocence of the prisoner; and his counsel insisted the examination proved their incompetency.
The principles upon which this question is to be decided are correctly set forth in Garlitz vs. State, 71 Md., 299.
The court there said:
“All persons accused of crime are entitled, as matter of right, to be tried by a fair and impartial jury, selected according to law. About this there can be no question. But the question is constantly presented in practice: by what standard or test is the condition of the mind to be tried, in order to obtain with reasonable certainty, the requisite degree of fairness and impartiality in those called upon to serve as jurors? In this age of intelligence and universal reading, with newspapers in the hands of every man with sufficient intelligence to qualify him to sit upon a jury, to require that jurors shall come to the investigation of crime committed in their community, no matter how notorious or atrocious it may be, with minds wholly unaffected or unimpressed by what they may have read or heard in regard to it, is simply to maintain a rule or standard by which every man who is fit to sit upon a jury may be excluded. Many crimes are committed under circumstances of such flagrant atrociousness as to impress and shock the whole community, the ignorant as well as the intelligent; and if such rule of exclusion were applied, it would in many cases render the impannelling a jury impossible. Such state of things could never be contemplated by the law. All men, by natural instinct, are supposed to be more or less biased against crime in the abstract; and every member of the community, against which crime has been committed, is naturally interested and impressed with the circumstances of crimes of atrocious character. But this natural bias,' however atro *460 cious the crime, can never be regarded as a sufficient cause for the disqualification of the juror. The intellectual, as well as the moral impressions, produced by the reading or hearing of reports or statements of facts in regard to the commission of crime are such that intelligent mind-si cannot resist; indeed, in many cases, the mind receives the impressions from such statements intuitively. But these impressions, with intelligent, fair-minded men, are always of a hypothetical nature, resting upon the supposition of the truth of what they have read or heard. The minds of such men are always open to the correction of former impressions, and remain entirely impartial, with power to hear and determine upon the real facts of the case, without the least bias in favor of former impressions, whatever they may have been. And, therefore, in our present state of society, all that can be required of a juror, to render him competent, is that he shall be without bias or prejudice for or against the accused, and that his mind is free to hear and impartially consider the evidence, and to render a verdict thereon without regard to any former opinion or impression existing in his mind, formed upon rumor or newspaper reports. Whenever it is shown that such is the state of mind of the juror, he should be held to be competent; and such is the rule as laid down by this court in the case of Waters vs. State, 51 Md., 430. In that case, it was said ‘that the opinion which shall exclude a juror must be a fixed and deliberate one, partaking in fact of the nature of a pre-judgment’ ”
In Reynolds vs. United States, 98 U. S., 156, the court defined the duty of an appellate court when called upon to review the rulings of the trial court in deciding on the qualifications of jurors:
“ The finding of the trial court upon that issue ought not to be set aside by a reviewing court, unless the error is apparent. No less stringent rules should be applied by the reviewing court in such a case than those which govern in the consideration of motions for new trial because the ver *461 diet is against the evidence. It must be made clearly to appear that upon the evidence the court ought to have found the. juror had formed such an opinion that he could not in law be deemed impartial. The case must be one in which it is manifest the law left nothing to the conscience or discretion of the court.”
The justice and good sense of this rule is apparent when it is considered that the trial court has the advantage of observing the appearance and intelligence of the juror and thus judging of his character, not possessed by a reviewing court. We can well understand that the trial court may be entirely justified in accepting one of two jurors and rejecting the other, although their answers may appear from the record to have been identical; for the one may have exhibited in his deportment entire respectability and candor, while the other may have given evidence of insincerity and evil habits.
This is well stated in State vs. Muncrath, 78 Iowa, 273:
“ It is the duty of the court, and not of the juror, to determine whether or not his opinion disqualifies him to act as a juror and to decide as to the fact of qualification of the juror from a consideration of such other evidence and circumstances as may be relevant and tend to aid it in reaching a just conclusion. A conscientious juror may be in doubt as to whether the opinion he has formed will affect his verdict, while the court may be entirely satisfied that he would perform the duties of a juror impartially, and in all respects as required by law. Another juror might believe and state that he could listen to the evidence and render a verdict without regard to his previously formed opinion, while the court might be entirely satisfied from the examination as a whole that his opinion could not be readily overcome, and that he could not discharge the duty of a juror properly. The court might be greatly aided in its determination of the fact by the appearance of the juror, his manner while undergoing ' examination, and circumstances surrounding the trial, and in cases of doubt this *462 court will not interfere with the decision of .the court below.”
The almost universal test proposed to ascertain whether the juror entertains a bias or prejudice against the prisoner is to inquire whether he has formed or expressed an opinion as to his guilt or innocence. To remain satisfied with his categorical reply, whether in the affirmative or negative, in .a case that has attracted general attention, might do injustice to the prisoner, or to the government; for the'juror may either be self-deceived as to what constitutes a disqualifying opinion; or he may be willing the court should be deceived. Unfortunately, the increasing disposition of the better class of jurors to avoid service in capital cases is a matter of common observation. To the natural reluctance that all persons must feel to stand as arbiters of life and death, is addeddn their case, the certainty of serious discomfort from prolonged confinement, increasing in duration with the constantly increasing length of such trials; and the apprehension that, in the words of one of the judges, when the trial of the prisoner is ended in conviction, that of the jurors may be expected to begin. Under such influences, it is not altogether surprising that one may be willing to persuade himself he holds an opinion that would disqualify him. To accept such a response without further inquiry would soon result in a practical impossibility to obtain a respectable jury at all, in a conspicuous case, and the accused would either be tried by unfit jurors, in the interest of a notable prisoner, or go untried altogether and ultimately escape any punishment beyond such pecuniary mulct as may represent the expense he or his friends have incurred in warding off a trial. The good order and safety of society require that such a result should be prevented, for the public has as great an interest at stake as the prisoner.
The jury duty devolved upon the citizen is no more voluntary than his similar obligation to render military service. He can escape from neither upon the strength of his mere representation of his unfitness, and thus be allowed at his will to *463 cast his obligation upon others, whose burden grows heavier by every such exemption. The duty of the examining authority, instead of ceasing when the citizen, in either case, has made his general claim to exemption, may more properly be said to have then really begun.
In the Burr trial, every one of the hundreds of persons summoned as jurors, with scarcely one exception, answered on his voir dire that he had formed an opinion. The attorneys for the United States could not have been far wrong when they expressed their helief that to obtain a jury in that case entirely free from all opinions as to the guilt or innocence of the prisoner was not possible, unless it should be dropped from Heaven, or be composed of hermits who had passed their lives immured in caves or hollow trees.
The same conditions appeared in the Guiteau trial.
But impartial jurors were finally obtained in each case, by a careful analysis by the court of the sources and extent of .their alleged opinions. There must be few persons of intelligence in this country, who have not heard and participated in discussions as to the probabilities of the guilt of the person charged with the savage murder of her parents at Fall River a short time since; and atrocious crimes committed in even foreign countries, attract almost the same degree of attention here, and give rise to similar expressions of opinion, on the newspaper accounts of the facts or of coroners’ inquests. But as all sensible persons observe the reports vary in the different newspapers of the same day, and -in successive issues of the same newspaper, it is impossible to believe such opinions can have a disqualifying effect upon the minds of men of average good sense. If this were so, the very lawyers who are employed to defend the accused and are on the alert to pronounce intelligent jurors disqualified, would find it their duty to decline service in a case they had thus necessarily prejudged.
Although the oath taken on the voir dire is to make true answers to such questions as may be asked by the court, the examination is often conducted in great part by counsel *464 whose experience has taught them exactly what are the crucial points involved in the inquiry. Under such examinations, an ignorant person, appearing in court perhaps for the first time as a juror, with the limited vocabulary of the uneducated, may naturally assent to questions not fully understood; or by using technical terms in an inexact manner, may indicate the formation of disqualifying opinions; until a careful examination by the judge, the one person concerned in the inquiry who must be supposed to be entirely disinterested in any result except the attainment of justice to the prisoner and the community, may evince an impartiality fitting him to serve.
In Clark vs. Commonwealth, 123 Penn. State, the court enforces this idea, and the more recent decisions of the highest court of that State are in entire accord with these utterances. In 126 Pennsylvania, page 71, Rizzoli’s Case, the court uses this language:
“There was a time when a stricter rule prevailed, and a juror was excluded from the box when he had formed an opinion as to the guilt or innocence of the accused. At that time, intelligent jurors could be found who had formed no opinions in regard to a case, for the reason that they had heard or read little about it. That was before the telegraph and the press brought to every man’s door the news of every event and every crime, within a few hours of its occurrence, with full details of everything connected therewith. All this is now changed; within twenty-four hours of the commission of this murder, it is safe to say that by means of the wire and the press, the details of it had been read by nearly every intelligent man, not only in Luzerne county, but in the State, and that but few persons had not formed some opinion in regard to it. The law upon this subject has necessarily advanced with the changed circumstances; it has .merely kept abreast of the times, and adapted itself to what the common judgment and common sense of the people see is essential to the proper administration of the criminal law. To return now to the old rule would exclude *465 from the jury box in many instances every man of average intelligence.”
And in 129 Pa. State, Com. vs. Taylor, Chief Justice Paxton, after a repetition of the true rule to be observed by the court in passing on challenges to jurors, says: “We need not discuss the subject further; it is worn threadbare and the law ought to be well understood.”
It seems to us this is but a recital of the principles declared by Chief Justice Marshall more than eighty years ago in Burr’s Case. Unfortunately, in later days, there was exhibited in certain parts of our country a departure from them which culminated when a disclosure was made in a western city that the friends of prominent criminals had collected all the unfavorable notices of the accused, and had mailed them to each juror on the panel whom they wished to remove from the jury. Upon the admission, by the jurors that they had read the notices and had formed an opinion upon the assumption of their truth which it would require evidence to remove, they were held incompetent to serve. The statutes since passed in many States, libe that commented on in the Spies Case, were the expression of' the indignation of sensible people at this departure from these rational principles.
The first juror whose examination is made the subject of exception in the present case was Peter A. Mattern, who said he had read the account of the trial in the newspapers when the trial was on before, three or four years ago, and had formed an opinion; but notwithstanding that opinion he could listen to the testimony and bring in a verdict based upon the evidence and the law as he heard it, regardless of that opinion. On cross-examination, he said the opinion he had formed was still in his mind. “ It is not quite fixed,, but it may be altered by evidence. It would require evidence to alter it. I have an opinion formed, a distinct impression upon my mind that it would require evidence to change or alter.” On his redirect examination, he said: “I understand that if no evidence should be introduced I *466 cannot find a verdict against the defendant upon the opinion I have; that the verdict must be rendered upon the evidence I hear in court and not on what I have read. I think I can render a verdict in the case upon what I hear here, and not upon the opinion that I have now. The opinion I have formed is at present settled and fixed in my mind. If the evidence at this trial should be the same as the last, I do not think my opinion would be changed in any sense. I read the evidence at the last trial. Probably if I heard the evidence word by word, my opinion would be changed.”
He afterwards said: “I have not expressed an opinion, but I had formed an opinion at the time> from reading the newspapers. I can listen to the evidence now and bring in an impartial verdict based on the evidence alone. The opinion formed by me was based upon the evidence given at the last trial, read by me in the newspapers. It was on the account in the newspapers of the transaction at the dime it happened and the report of the trial when the trial was on. I am of the same opinion still. The opinion was formed from reading the testimony, the evidence, as delivered in court on the last trial of this case. I was not in court at the last trial, but I read the evidence in the newspapers.”
He was asked the question: “That opinion would remain in your mind and would influence you more or less all through this trial, would it not, if you were to sit on the jury?” He answered: “I do not know whether it would influence me upon the evidence that I hear now. I cannot recollect all the evidence that was given at that time in the newspaper now, but if all the evidence of all the witnesses was given here, and I was on the jury, I could probably give a fair verdict. The opinion that I formed from reading the evidence ait the previous trial is in my mind now, but it would not control my verdict in this case to any extent.”
Thereupon, having been pronounced competent by the court, the juror was peremptorily challenged.
Charles C. Bryan was the next juror sworn.
*467 “ Mr. Cahill. You have formed an opinion?
A. Yes; I think it is likely that I have.
Q. And you have told us that it would require strong evidence to change that opinion? Is not that the fact?
A. Yes; that is the fact.
The Court. You méan that the prisoner would require—
The witness (interrupting): It would require of the defendant strong proof of his innocence.”
The witness was told to stand aside, but was afterwards recalled, and stated as follows:
“ Notwithstanding the opinion I have formed, I could give an impartial verdict upon the evidence and law as it might be given here in court.
Mr. Cahill. The opinion that you have formed is your opinion at this moment; is it not?
A. Yes; I think it is.
Q. And that opinion is formed both from the newspaper •accounts of the occurrence and also of the account of the trial?
A. Yes.”
Upon further examination of Mr. Bryan by counsel for defendant, he stated that he had no doubt but that he could give the defendant a full, fair and impartial trial solely upon the evidence that might be given in court.
Thereupon (the juror being accepted by the court), the defence challenged him peremptorily.
The next juror sworn was John Ockershausen, who testified:
“ I have talked about the case, but I did not exactly form my opinion about it. I have read about it in the paper. I guess I could listen to the evidence and return an impartial verdict. I have not exactly a bias for or against the prisoner. I do not know him.” On cross-examination he said: “ I have talked to various persons about this case at the time it happened; talked about it frequently. I have not exactly an opinion in my mind now, but at one time I made up my mind. It was thoroughly made up at that time. I *468 do not know that I have exactly changed my mind. I have not heard anything about the case which has changed my mind, and I am of the same opinion still. I guess it would require strong evidence upon the part of the defendant to change my opinion.”
The juror was afterwards further examined, and said: “I guess I have an opinion as to the guilt or innocence of the defendant. The opinion is based upon what I read in the newspapers, but I can listen to the evidence in the court and render a verdict in accordance to the sworn evidence I hear.” On cross-examination, he said: “ I think that my opinion is a strong and pronounced one, and it is still in my mind. I have never changed it.”
"Mr. Cahill. Now, I ask you if it would require evidence to change the opinion, and I want you to answer that question yes or no. Would it require evidence to change that opinion?
The court. I do not think that is a fair test. I notice that the jurors do not understand the question at all, and I do not think it is a proper question.
Mr. Cahill. Is that opinion for or against the prisoner still in your mind?
A. Yes.
Q. You say that this bias for or against the prisoner is still in your mind?
A. I say that it is not exactly now in my mind.
Q. Are you of the same opinion now that you were when you formed an opinion on reading the account of the last trial in the newspapers?
A. I guess I am of the same way now, yet.
Q. Would it require evidence to change it?
Objected to by the court.
And thereupon the juror having been declared competent by the court, the defendant challenged him peremptorily.”
It will be observed that neither of these jurors pretends to any personal knowledge of any of the facts of the case; nor that he had talked with any person having such know *469 ledge, nor that he had received whatever opinion he entertained or had formed from any source other than reports in the newspapers and rumors; nor that he entertained any ill-feeling toward the prisoner; neither can the testimony of either juror, when considered in its entirety, be fairly taken as showing that he held an opinion which could be considered as “positive” or “decided” or “substantial” or “fixed” or “deliberate” or “settled,” as the opinions that have been held disqualifying have been previously defined by the authorities. Taking all his testimony together, each juror sufficiently states that he could render an impartial verdict upon the evidence alone as delivered to the jury: and such a condition of mind on his part would render him a qualified juror, notwithstanding the alleged opinion he may have formed from reading the newspaper or listening to rumors. As neither of them served upon the jury that rendered the verdict against the prisoner, whatever injury is claimed to have been suffered by the prisoner in being obliged to use his peremptory challenges to remove them must be purely conjectural; although he has the right to an examination on appeal of the correctness of the rulings of the judge below as to their competency
Their responses are criticised upon the ground that they spoke with a reserve or hesitation as to their capacity to render an impartial verdict, using the expression, “I think,” “ I guess.” But they made use of the same form of expression when avowing the formation of an opinion; and if this is to be understood as implying a positive affirmation, it should equally when used by the same men in negation, be taken as implying positive denial. The expressions are used by court and counsel in the questions, as well as by jurors in reply. True, by a particular emphasis, a more or less doubtful meaning might be attached to them, as “I think I could,” rather than “ I think I could? But the justice below heard the words uttered, and could better apprehend the meaning of the speaker. That the phrase ex vi termini imports no such uncertainty, sufficiently appears from *470 its frequent use in many cases where it was received by the court as a positive assertion — as in the Reynold’s Case, 98 U. S., 146; and in the Spies Case, 123 U. S., 131, where the witness Denker used the words “ I think ” twelve times, in replying to such inquiries on his voir dire.
Ockershausen, in reply to a question, said: “I have not exactly a bias for or against the prisoner.” Subsequently the defendant’s counsel asked him: “You say that this bias for or against the prisoner is still in your mind?” to which he replied: “ I say it is not exactly now in my mind.”
In 120 U. S., 432 (Hopt vs. Utah), the expression was used by a juror under examination, “that possibly his impressions were strong enough to create, from sympathy, some bias or prejudice, but he thought he could sit on the jury, and be guided by the evidence,” etc. But his whole examination satisfied the trial judge of his competency, and that ruling was approved by the Supreme Court.
Again, it is insisted the opinion avowed to have been formed by the jurors must be held to be necessarily disqualifying, because they stated, in reply to questions asked a moment afterwards, they still held those opinions (as if that fact evinced a certain obduracy on their part) and that it would take evidence to remove them.
In Garlitz vs. State, 71 Md., 301, the court, speaking of this mode of examination, said:
“ It is urged, however, that these talesmen swore they still retained their original impressions in regard to the case, and that it would require evidence to remove such impressions, and therefore the challenges should have been allowed. But it is a very simple and elementary law of the human mind that an impression once made will not be effaced without some adequate cause to effect the result. A man cannot readily divest his mind of former impressions without reason or evidence therefor, and render his mind a blank at his mere will. It was, therefore, quite natural for these tales-men to say that it would require some evidence to change their former impressions. Indeed, such must be the case, *471 to a more or less extent, in all instances where jurors are sworn who had previously formed opinions or impressions in regard to the case, upon rumor or newspaper reports. But it does not follow that such condition of the mind renders the juror incompetent. Spies vs. Illinois, 123 U. S., 168.”
After a careful examination of the testimony of the jurors and of the numerous authorities discussing this important question, we are all of the opinion there was no error in the rulings below as to the challenges on the ground of bias.
4. The court below admitted as a competent juror Thomas A. Dobbyns, who, it was claimed, was “ a salaried officer of the Government of the United States” and as such exempt from service as juror, against the challenge of the defendant; and to this ruling an exception was taken. It appeared the juror expressly claimed the benefit of the exemption, under Sec. 875, Revised Statutes of the District of Columbia, which declares that “all executive and judicial officers, salaried officers of the Government of the United States, commissioners of police, etc., etc., shall be exempt from jury duty, and their names shall not be placed on the jury lists.”
We decided in United States vs. Lee, 4 Mackey, 489, that exemption from jury duty, under that section, was not a disqualification of the juror from service, but a personal privilege only, and unless he chose to make the claim, it could not be taken advantage of on a motion for a new trial. In that case, no such claim had been interposed by the juror who was held to have thereby waived his personal privilege, and hence the defendant could have no ground for complaint. Where the juror, as in the case at bar, insists upon his exemption, “the court,” in the language of 43 N. H., 89, State vs. Forshner, “would ordinarily decline to hold him to a duty to which he is not liable, and would, of course, excuse him.” 57 Maine, 396, State vs. Quimby.
But we are ,of the opinion the case of this juror was not *472 within the exemption of section 875. His claim was that he was employed as a stamp agent by the Government to sell stamps, and received a small compensation per annum. This employment did not constitute him “ a salaried officer of the Government of the United States.”
All employees and agents of the government are not officers in the proper sense of the term. In 99 U. S., 508, United States vs. Germaine, it was held that a civil surgeon, appointed by the Commissioner of Pensions to make examination of pensioners, at a designated compensation for each examination, was not within the terms of a statute punishing every officer of the United States who should prove to be guilty of extortion. In 17 S. & R., 219, Commonwealth vs. Burns, an editor appointed by the Secretary of State to print the laws of the United States in his newspaper, was held not to' be disqualified to act as an alderman of Philadelphia, under a statute which provided that every person who should hold any office or appointment of profit or trust under the United States should be incapable of acting as an alderman, etc., of any city in Pennsylvania. In the words of Chief Justice Marshall, 2 Bro. C. C. R., 103, United States vs. Maurice, “although an office is an employment, it does not follow that every employment is an office.”
The act of Congress in 1889, Ch. 374, authorizing the Postmaster-General to fix the salaries of certain clerks and employees attached to his department, and the subsequent order fixing their compensation, provides that “ stamp clerks” shall receive a salary, at a stated rate, and that stamp agents shall be compensated at $24 per annum. Mr. Dobbyns was precisely what he described himself to be, “ a stamp agent”; an employee of the department, but neither a clerk nor an officer in any legal sense. We think, therefore, the trial, justice had the right, in the absence of any other objection, to require him to serve as a juror.
5. It remains to consider whether, as is insisted by defendant’s counsel, the verdict of the jury was against the *473 evidence. We have examined and compared the testimony of the different witnesses, and the result of the conflicting statements is about as follows:
The witnesses for the prosecution testified substantially that the prisoner for three or four years had been living with Agnes Watson as his mistress in Washington, near Rock Creek. They were both colored people, as were most of the witnesses. The woman had become jealous at Barber’s attentions to Celia Mahoney, with whom he had consorted for two years. She lived in Georgetown, on Thirtieth street, half a square- north of the canal. Mary Hardy, about noon orj the day of the drowning, saw Barber and Agnes in their room quarrelling; he took some money from her and then knocked her down with his fist, and kicked her, and said: “ God d — n her heart, he would kill her ”; after 11 o’clock at night, and about half an hour before her death, Agnes came to Celia’s house, where Barber then was, and sent a message to him to come out, as she wanted to see him; Barber replied, “God d — n her, if I come out I will kill her.” Agnes was not told what Barber had said, and she sent another woman with the same request, to which Barber made the same reply. Agnes remained in the yard for about fifteen minutes, when Barber came out of the* house; a quarrel soon ensued, and he knocked her down and kicked her or stamped on her about the body as she clutched his feet.
As he walked out of the yard, Agnes followed him, and he said to her, “ If you follow me I will kill you,” to which she replied she would follow him; whereupon he again knocked her down: The same warning and answer and blows were repeated at least twice as they walked south along the sidewalk until he reached a path leading through a vacant lot to the towpath of the canal, down which he walked, followed by Agnes. Seven witnesses, with unimportant differences of language, testify to the occurrences up to this point.
Edward Brown and James Brown, his brother, saw them *474 soon afterwards standing together near a post on the towpath, and swear they saw Barber again knock Agnes down, kick her, choke her and throw her into the canal. Martha Washington and William Johnson also testify they saw him throw her into the canal, but say. nothing of the blow or choking. Barber remained on the towpath a short while after he had thrown her into the water, but made no effort to rescue her; and after a crowd assembled, walked up the bank and returned to Celia Mahoney’s house by another street. Celia had heard by that time of the woman’s death, and asked him what had become of Agnes, to which he replied he didn’t know, that she had gone home; and Celia then told him to go. Before he left the canal bank, and while efforts were being made to recover the body, Turner asked Barber what had become of the woman, and he replied, “ D- — d if I know; I have just come from the ice-house.” Martha Washington testified that Barber said in her presence on the towpath “ That d — d woman has jumped overboard.” Mary Smith met him on Jefferson street shortly after he left the canal; asked him where Agnes was or what had become of her, and he replied he thought she had gone around the square and gone home.
Sanford, a policeman, arrested Barber the next night on a charge of murder, about 9 or 10 o’clock, when he was in bed at his brother’s house. He testified that on the way to the station house he asked Barber how it happened, and he replied that he pushed her and didn’t know whether she fell in the water or not. Another policeman said that on the day following the arrest he told the prisoner “they had charged him with having thrown the woman into the canal,” to which he replied, “ Well, maybe I did.”
The defence was that the deceased, in a fit of jealousy, because of her desertion by Barber, had committed suicide by throwing herself into the canal. In support of this theory, Reuben Johnson and his wife testified in his behalf that on the morning of her death they heard her say if Barber married Celia, she would either drown herself or take *475 poison to kill herself. A policeman, Barry, who was with the squad that accompanied Barber to the station house, testified he heard him make no remark to Sanford in reference to the drowning; though Sanford had immediate charge of the prisoner and might have asked the question and received the reply. The deposition of Mr. Burroughs, a white man, which had been read at the first trial, was also admitted in evidence in behalf of the prisoner. He deposed he lived across the street from Celia Mahoney, and about n at night was attracted by a noisy crowd in front of her house; he heard oaths and screams of a woman, and on crossing the street he was told a colored man was beating a woman; the man then came out of the yard, and seemed to be trying to get away from the woman; the crowd prevented Burroughs from seeing the parties as they walked towards the canal. The witness walked down to the path, and saw the man and woman and the boy Larue on the towpath; his attention was then diverted from them, and presently there was a cry that the man had thrown the woman overboard; and he then walked down to the towpath and had a conversation with Larue; Officer Riley came up, and asked Barber where the woman was, and he replied, “I don’t know; but think she is over there,” pointing to the lock; he didn’t see Barber after the crowd became loud and clamorous; the moonlight was unusually bright that night; after the exclamation was made about the woman being in the canal, he had walked down to the towpath and saw her hat floating on the water. He did not say anything as to having seen the woman in the canal.
Mr. Fergusson, one of defendant’s counsel, swore the boy Larue, then thirteen, testified at the former trial that he saw Agnes follow Barber down the street and heard him warn her to go back, and heard her refuse to do so, but saw no blows struck; that after they had gone down on the towpath', he followed them there and heard Barber again tell Agnes she had better go back, and heard her say she would not; that the woman then went and sat down on the *476 coping of the lock, 'and Barber turned- toward her, and said, “You d — -d old fool, get up from there”; “that Barber turned, and she slipped right into the canal”; that Barber pushed Agnes in front of Celia’s house, but he saw no blows struck; that Larue at one time in Ms testimony said the defendant was about 40 feet from the woman “when he pushed her in,” but at once corrected himself, and said “when she pushed herself in.”
The prisoner denied all previous threats against Agnes, or quarrels with her; he denied all blows given her that night, or any violence except pushing her in the yard, and shoving her against a tree when they reached the sidewalk. He positively denied that he threw her into the canal or wanted to get rid of her, and asserted she slipped or jumped into the canal herself, while he was 30 or 40 feet from her; that he did not go in after her because he could not swim. He denied having made the so-called confessions to the policeman, or the contradictory statements testified to by the other witnesses; said he did not mean to try to escape by going to his brother’s; and that he did not see that night some of the witnesses for the prosecution near the place.
We have considered it proper to make a careful examination of the law and the facts, all the more solicitously because the prisoner belongs to an unfortunate class of people who ordinarily have no sufficient means of their own at command to maintain long proceedings like those in this case. But he has not suffered in this respect, for zealous and able counsel have done whatever was possible in his behalf. The unfortunate woman belonged to the same class, and had the same right to her life that he had to his; and it is the duty of the law to see that her destroyer should not escape punishment, if he is guilty: “The judge is condemned when the guilty escape.” By a great preponderance of witnesses, establishing his guilt beyond the reasonable doubt of the law, he lias been shown to be guilty of the heartless murder of this poor creature, so long under his dominion and the helpless object of his brutality.
*477 We can find no reason for believing upon the whole testimony, the jury was not entirely justified in rendering the verdict of guilty that had been given by their predecessors on the former indictment. Upon the motion below for a new trial, based upon the same ground, the presiding justice declined to interfere, and his action in this respect confirms our belief in the propriety of the verdict.
We have no alternative but to overrule the motion for a new trial, and remand the case to the Criminal Court; and it is so ordered.